OPINION
{¶ 1} Defendant-appellant James A. Russell appeals his conviction and sentence for one count of aggravated robbery, one count of murder (proximate result), one count of tampering with evidence, one count of grand theft of a motor vehicle, one count of gross abuse of a corpse, and one count of having weapons while under disability. Each count for aggravated robbery, murder, and theft of a motor vehicle also contained an additional three-year firearm specification.
 {¶ 2} On December 10, 2004, Russell was indicted on the following charges: Count I, aggravated robbery, in violation of R.C. §2911.01(A)(1) (firearm specification); Count II, murder (proximate result), in violation of R.C. § 2903.02(B) (firearm specification); Count III, tampering with evidence, in violation of R.C. §2921.12(A)(1); Count IV, grand theft of a motor vehicle, in violation of R.C. § 2913.02(A)(1) (firearm specification); Count V, gross abuse of a corpse, in violation of R.C. § 2927.01(B); and Count VI, having weapons under disability, in violation of R.C. § 2923.13(A)(2). Russell pled not guilty to all six counts on December 21, 2004.
 {¶ 3} Russell filed a motion to suppress on January 27, 2005. A hearing was held on said motion on February 25, 2005, and concluded on March 11, 2005. On April 20, 2005, the trial court filed its decision and entry overruling in part and sustaining in part Russell's motion to suppress. Russell also filed a motion to waive jury trial with respect to the charge for having weapons under disability which the trial court granted on December 12, 2005.
 {¶ 4} Following a jury trial which began on December 12, 2005, and concluded on December 16, 2005, Russell was found guilty on Counts I through IV of the indictment. The trial court also found Russell guilty of having weapons under disability. On January 17, 2006, the trial court sentenced Russell to the following terms of imprisonment: 1) Count I: 10 Years; 2) Count II: 15 years to life; 3) Count III: 5 years; 4) Count IV: 18 months; 5) Count V: 1 year; and 6) Count VI: 5 years. The firearm specifications accompanying Counts I, II, and IV were merged into one 3-year term of imprisonment. All terms are to be served consecutively for an aggregate sentence of 40 years to life in prison. Russell filed a timely notice of appeal on February 3, 2006.
 I {¶ 5} In the early morning hours of September 1, 2004, Philip Troutwine, a safety inspector for the Federal Aviation Administration, left his Darke County residence to go to work at the Dayton International Airport. When he did not return home by the evening of September 3, 2004, Troutwine's wife, Patti, contacted the Darke County Sheriff's Department to report him missing.
 {¶ 6} On September 10, 2004, the Darke County Sheriff's Department received an anonymous tip from a female claiming that she had been given information concerning Troutwine's disappearance from a tenant of a small apartment complex at 2080 Auburn Avenue in Dayton, Ohio. In particular, the caller stated that she was told that Troutwine had been shot and killed after going to 2080 Auburn Avenue, Apartment 3, to visit a prostitute.
 {¶ 7} Darke County Sheriff's Office Detective Sergeant Mark Whittaker then contacted the Dayton Police Department concerning the anonymous tip. On September 10, 2004, Whittaker, accompanied by Dayton Police Officers, traveled to 2080 Auburn Avenue and located the caretaker of the rental property, Chauncey King, who granted them access to the apartment. King testified at the motion to suppress that he told the police that Apartment 3 had been occupied by Russell and Candace Hargrove, but they had moved out and abandoned the apartment according to one of the other tenants at 2080 Auburn Avenue, Lisa Dillard. In fact, King testified that he had personally gone to the apartment previously and determined that it was abandoned after which he gave Dillard permission to enter the apartment and remove any items of furniture that had been left behind. Based on the statements made by King, Detective Whittaker and Dayton Police Officers entered the apartment and searched for evidence of a crime. Dayton Crime Scene Investigators discovered blood on a doorframe that was eventually determined to be Troutwine's blood.
 {¶ 8} Approximately two weeks later on September 25, 2004, the body of Troutwine was discovered in the trunk of his car which was found parked in the parking lot of an apartment complex in West Carrollton, Ohio. Troutwine had been shot once in the head and wrapped in plastic garbage bags and tent material.
 {¶ 9} On October 25, 2004, Russell and Hargrove were removed from a bus in Los Angeles, California, and charged with the murder of Troutwine. The couple was extradited back to Ohio where, in exchange for a reduced sentence, Hargrove agreed to testify against Russell whom she stated had murdered Troutwine after attempting to rob him.
 {¶ 10} Pursuant to her agreement with the State, Hargrove testified at trial that she and Russell were living together at 2080 Auburn Avenue, Apartment 3 at the time of the murder of Troutwine. Hargrove, an admitted prostitute who was six months pregnant when the murder occurred, testified that Troutwine had contacted her to arrange a meeting for sex. Hargrove further testified that on September 1, 2004, she spoke to Troutwine over the telephone and provided him with directions to her apartment at 2080 Auburn Avenue so that the two could engage in sexual intercourse for money.
 {¶ 11} Records from the Dayton International Airport reveal that Troutwine arrived at work at 6:27a.m. on September 1, 2004, but left shortly thereafter at 8:27a.m., ostensibly so that he could meet with Hargrove at her residence. Hargrove testified that she had been out the entire night before and that she did not want to have sex with Troutwine. Instead, she and Russell, who was at the apartment, hatched a plan to rob Troutwine upon his arrival. Hargrove stated that she was going to lure Troutwine to the back of the apartment where Russell would then surprise Troutwine and rob him. Hargrove testified that she was unaware that Russell planned to use a gun in the commission of the crime.
 {¶ 12} After Troutwine arrived, Hargrove let him in the apartment and began to lead him to the bedroom at the rear of the apartment. While Hargrove and Troutwine were in the kitchen which adjoined the bedroom, Russell came out from his hiding place, pointed a gun at Troutwine, and told Hargrove to go back into the front room. Hargrove testified that she heard Russell demand money from Troutwine and then she heard a single shot from a firearm. Russell ran into the front room and told Hargrove that he did not mean to shoot Troutwine but that they now needed to dispose of the body and clean up the blood in the kitchen.
 {¶ 13} Hargrove and Russell wrapped Troutwine's head and torso in a garbage bag to contain the blood. Russell then took Troutwine's car keys and pulled his vehicle around to the rear of the apartment building. Russell took a tent he had found outside and went back into the apartment. He and Hargrove wrapped the body in the tent and placed it in the trunk of Troutwine's vehicle. Hargrove went back to the apartment to change clothes while Russell drove the vehicle and parked it behind a vacant building. Russell returned to the apartment, and he and Hargrove began cleaning the kitchen where the shooting had taken place. One of Russell's friends came to the apartment and took Hargrove to buy additional cleaning supplies. After returning from the store, they finished cleaning the apartment and began making arrangements to leave. Hargrove packed suitcases for both she and Russell, and the couple walked to her cousin's residence nearby and placed the suitcases in the basement. Hargrove testified that she and Russell then retrieved Troutwine's car from behind the vacant building and drove it to the apartment complex in West Carrollton where it was located three weeks later.
 {¶ 14} Hargrove and Russell returned to Dayton, but did not go back to the apartment at 2080 Auburn Avenue. Instead, the two stayed at Russell's sister's residence for a few days and then traveled to Louisville, Kentucky, after Russell's mother bought them bus tickets. Hargrove and Russell left Louisville after approximately a week and traveled to Detroit, Michigan, where they stayed with Russell's cousins. The couple's final destination was Los Angeles, California, where they were arrested and eventually transported back to Dayton, Ohio, to stand trial in connection with the murder of Troutwine.
 {¶ 15} After a jury trial, Russell was convicted of all of the charges contained in the indictment and sentenced accordingly. It is from this judgment that Russell now appeals.
 II {¶ 16} Russell's first and second assignments of error are as follows:
 {¶ 17} "THE TRIAL COURT ERRED IN FAILING TO SUPPRESS EVIDENCE GAINED FROM AN ILLEGAL SEARCH, IN VIOLATION OF APPELLANT'S RIGHTS UNDER THEFOURTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AS WELL AS SECTION 14, ARTICLE 1 OF THE OHIO CONSTITUTION."
 {¶ 18} "THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S MOTION TO SUPPRESS WITH RESPECT TO THE OFFICERS' ILLEGAL SEARCH OF THE APARTMENT."
 {¶ 19} In his first and second assignments, Russell contends that the trial court erred when it overruled his motion to suppress the physical evidence collected by the Dayton Crime Lab at 2080 Auburn Avenue, Apartment 3. Specifically, Russell argues that the police officers did not have sufficient indicia that he and Hargrove had abandoned the apartment such that a search warrant was unnecessary. However, we agree with the trial court that Russell had abandoned the premises prior to the time of the search. Thus, Russell lacks standing to raise theFourth Amendment issue as a reason for excluding the evidence.
 {¶ 20} With respect to a motion to suppress, "the trial court assumes the role of trier of fact and is in the best position to resolve questions of fact and evaluate the credibility of witnesses." State v.Hopfer (1996), 112 Ohio App.3d 521, 548, 679 N.E.2d 321, quotingState v. Venham (1994), 96 Ohio App.3d 649, 653, 645 N.E.2d 831. The court of appeals must accept the trial court's findings of fact if they are supported by competent, credible evidence in the record. State v.Isaac (July 15, 2005), Montgomery App. No. 20662, 2005-Ohio-3733, citingState v. Retherford (1994), 93 Ohio App.3d 586, 639 N.E.2d 498. Accepting those facts as true, the appellate court must then independently determine, as a matter of law and without deference to the trial court's legal conclusion, whether the applicable legal standard is satisfied. Id.
 {¶ 21} It has long been settled that "[a] defendant has no standing under the Fourth Amendment to the United States Constitution to object to a search and seizure of property that he has voluntarily abandoned."State v. Freeman (1980), 64 Ohio St.2d 291, 414 N.E.2d 1044, paragraph two of the syllabus. As the Ohio Supreme Court has reiterated:
 {¶ 22} "Abandonment is primarily a question of intent, and intent may be inferred from words spoken, acts done, and other objective facts.United States v. Cowan (C.A.2, 1968), 396 F.2d 83, 87. All relevant circumstances existing at the time of the alleged abandonment should be considered. United States v. Manning (C.A.5, 1971), 440 F.2d 1105, 1111. The issue is not abandonment in the strict property-right sense, but whether the person prejudiced by the search had voluntarily discarded, left behind, or otherwise relinquished his interest in the property in question so that he could no longer retain a reasonable expectation of privacy with regard to it at the time of the search. United States v.Edwards, supra, 441 F.2d at 753; Katz v. United States (1967),389 U.S. 347, 83 S.Ct. 507." Id. at 297, quoting United States v. Colbert (C.A.5, 1973), 474 F.2d 174, 176.
 {¶ 23} In its decision and entry overruling the portion of Russell's motion to suppress which dealt with the police officers' search of the apartment at 2080 Auburn Avenue, the trial court stated in pertinent part:
 {¶ 24} "At the hearing, the Defendant stipulated that he did NOT have a reasonable expectation of privacy in the premises at 2080 Auburn Avenue, Apt. # 3. The Motion to Suppress is overruled for that reason alone. Nonetheless, the Court determines as a matter of fact that the Defendant and Ms. Hargrove had abandoned the apartment, had moved to California and did not intend to return."
 {¶ 25} After reviewing the record of the motion to suppress hearing, we hold that Russell is without standing to object to the search of the apartment he shared with Hargrove. First, and most importantly, Russell stipulated that he had vacated the apartment, that a killing had occurred in the apartment, and that he no longer had a reasonable expectation of privacy with respect to 2080 Auburn Avenue, Apartment 3, at the time the authorities entered and searched the premises.
 {¶ 26} Additionally, Detective Whittaker's belief that the apartment was vacant was objectively reasonable based on the assertions of the caretaker, King, who had been informed by other residents in the complex that Russell and Hargrove had left the premises in a hurry and taken most of their personal belongings with them. Based on his own personal examination of the premises in question, King had given other tenants permission to enter the apartment and remove any items that had been left. King stated that when he entered the apartment the doors were not locked. Moreover, no attempt was made by Russell to provide payment for rent for the month of September, nor had either Russell or Hargrove picked up their mail. Thus, we agree with the trial court "as a matter of fact that the Defendant [Russell] and Ms. Hargrove had abandoned the apartment * * * and did not intend to return." In light of Russell's stipulation, however, henow has no right to object to the constitutionality of the search of the premises at 2080 Auburn Avenue, Apartment 3.
 {¶ 27} Russell's first and second assignments of error are overruled.
 III {¶ 28} Russell's third assignment of error is as follows:
 {¶ 29} "THE EVIDENCE IS INSUFFICIENT, AS A MATTER OF LAW, TO SUSTAIN APPELLANT'S CONVICTION FOR GRAND THEFT OF A MOTOR VEHICLE AND ITS ACCOMPANYING FIREARM SPECIFICATION."
 {¶ 30} In his third assignment, Russell contends that the evidence was insufficient to sustain his conviction for grand theft of a motor vehicle. Additionally, Russell asserts that there is insufficient evidence to demonstrate that the individual who stole Troutwine's car had a firearm in his possession when he did so. The crux of Russell's argument is simply that one cannot steal a motor vehicle from a dead person, and the thief would have no need to use a firearm to facilitate the theft.
 {¶ 31} The Ohio Supreme Court has clarified the distinction between reviewing questions of manifest weight of the evidence and questions of sufficiency of the evidence. In State v. Thompkins (1997),78 Ohio St.3d 380, 678 N.E.2d 541, the Court found that, in essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law. Id. at 386. As this Court stated inState v. Lucas (September 21, 2001), Montgomery App. No. 18644, the proper test to apply to such an inquiry is the one set forth in paragraph two of the syllabus in State v. Jenks (1991),61 Ohio St.3d 259:
 {¶ 32} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."
 {¶ 33} R.C. § 2913.02(A)(1) states in pertinent part:
 {¶ 34} "(A) No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways:"
 {¶ 35} "(1) Without the consent of the owner or person authorized to give consent."
 {¶ 36} In addition, R.C. § 2913.02(B)(5) states that "[i]f the property stolen is a motor vehicle, a violation of this section is grand theft of a motor vehicle[.]"
 {¶ 37} While Russell argues that the perpetrator's motive in taking the car was to conceal evidence of the crime, and not deprive the owner of the vehicle, the method he chose to accomplish this was by stealing the vehicle and moving it to a different location without the consent of the owner. While it is debatable as to whether Troutwine was still alive when the individual chose to take the vehicle, it is undisputed that he did not provide his consent, nor did anyone else ostensibly authorized to do so provide their consent. Moreover, it is abundantly clear that, in taking the vehicle and moving it to another location, the thief's purpose, by implication, was to deprive the owner of his property pursuant to the language of the statute. Thus, the appellant, having taken Troutwine's vehicle, was properly convicted of grand theft of a motor vehicle pursuant to R.C. § 2913.02(A)(1).
 {¶ 38} Lastly, it was clearly within the purview of the jury to find that Russell was in possession of the firearm he used to murder Troutwine when he absconded with the victim's vehicle. Hargrove testified that she did not observe a firearm after the shooting. Moreover, after she and Russell put the body in the trunk of the vehicle, Russell moved the vehicle behind a vacant building some distance away from the apartment where the shooting occurred. The evidence suggests that Russell was in possession of the firearm when he moved the vehicle, and the jury was free to make that finding and convict on the firearm specification attendant to the grand theft of a motor vehicle.
 {¶ 39} Russell's third assignment of error is overruled.
 IV {¶ 40} Russell's fourth assignment of error is as follows:
 {¶ 41} "APPELLANT WAS DEPRIVED OF EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED TO HIM UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AS WELL AS COMPARABLE PORTIONS OF THE OHIO CONSTITUTION.
 {¶ 42} In his fourth assignment of error, Russell contends that he received ineffective assistance of counsel at the trial level. In support of this assertion, Russell cites the following arguments: A) failure to properly investigate and prepare; B) failure to object to irrelevant and prejudicial testimony concerning Russell'shistory with Hargrove and their two children; C) failure to properly cross-examine witnesses; D) stipulating to abandonment of Russell's apartment; E) failure to object to admission of speculative testimony and testimony admitted without foundation; and F) failure to object to non-responsive testimony.
 {¶ 43} "When considering an allegation of ineffective assistance of counsel, a two-step process is usually employed. First, there must be a determination as to whether there has been a substantial violation of any of defense counsel's essential duties to his client. Next, and analytically separate from the question of whether defendant'sSixth Amendment rights were violated, there must be a determination as to whether the defense was prejudiced by counsel's ineffectiveness."State v. Bradley (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, citingState v. Lytle (1976), 48 Ohio St.2d 391, 396-397, 358 N.E.2d 623, 627, vacated in part on other grounds (1978), 438 U.S. 910, 98 S.Ct. 3135.
 {¶ 44} The above standard contains essentially the same requirements as the standard set forth by the United States Supreme Court inStrickland v. Washington (1984), 466 U.S. 668, 104 S.Ct. 2052. "When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness." Strickland, supra, at 687-688. "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."Id. Thus, counsel's performance will not be deemed ineffective unless and until counsel's performance is proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance. Id.
 {¶ 45} For a defendant to demonstrate that he has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, absent counsel's errors, the result of the trial would have been different. Bradley, supra, at 143. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Strickland, supra, at 694.
 {¶ 46} The arguments Russell submitted with respect to his claim for ineffective assistance of counsel will be discussed in the sequence presented in his brief.
A. FAILURE TO PROPERLY INVESTIGATE AND PREPARE
 {¶ 47} Initially, Russell argues that defense counsel provided ineffective assistance of counsel for failing to properly investigate and make himself aware of the charges in the indictment. Specifically, Russell asserts that defense counsel was unaware of which section of the murder statute his client was being charged with, "purposeful murder" (murder A) or "murder as a proximate result" (murder B).
 {¶ 48} While defense counsel may have misstated the nature of the murder count Russell was charged with, counsel's behavior throughout the course of the trial demonstrates that he adequately investigated and prepared for trial. The record clearly shows that defense counsel obtained discovery, prosecuted a motion to suppress that resulted in the exclusion of a portion of the State's evidence, hired a private investigator to bolster Russell's alibi defense, and successfully advised Russell to allow the charge of having weapons under disability to be tried to the bench which prevented the jury from being made aware that the appellant had been adjudicated delinquent on a murder charge in 1992. Defense counsel presented a coherent trial strategy which supported Russell's alibi defense and implicated someone else in the murder of Troutwine. Russell has failed to demonstrate that there is a reasonable probability that but for his counsel's conduct, the result of the case would have been different.
B. FAILURE TO OBJECT TO IRRELEVANT AND PREJUDICIAL TESTIMONY CONCERNING RUSSELL'S HISTORY WITH HARGROVE AND THEIR TWO CHILDREN
 {¶ 49} Russell next argues that he was provided ineffective assistance in light of his counsel's failure to object to testimony elicited by the State with respect to the length and timing of Russell's and Hargrove's relationship. In particular, Russell contends that counsel should have objected when Hargrove testified that she and Russell were having sexual relations before she was 13 years old. Russell argues that this evidence demonstrates that he raped Hargrove. He asserts that the jury could not fairly judge his guilt after hearing such inflammatory testimony.
 {¶ 50} A debatable decision involving trial tactics generally does not constitute a deprivation of effective counsel. State v. Phillips (1995),74 Ohio St.3d 72, 656 N.E.2d 643, 1995-Ohio-171. In State v.Clayton (1980), 620 Ohio St.2d 645, the Ohio Supreme Court discussed an attorney's choice of trial strategy and stated the following:
 {¶ 51} "* * * the fact that there was another and better strategy available does not amount to a breach of an essential duty to his client."
 {¶ 52} During trial, the State never attempted to characterize Russell as a rapist or a child molester. Obviously, the jury was entitled to information regarding the length and nature of their relationship.
 {¶ 53} Lastly, it was not ineffective assistance for defense counsel to fail to object to Hargrove's testimony that one of her and Russell's children was living with Hargrove's mother and the other child was living with her stepmother and father. Contrary to Russell's assertion, we do not find that the jury would immediately infer that the children had been taken from Russell and Hargrove's home on the basis of abuse or neglect. At most, the jury might look at Hargrove as a bad mother, and, therefore, untrustworthy. Such a finding might further bolster defense counsel's theory that Hargrove was a liar, her testimony implicating Russell in the murder of Troutwine should not be believed.
 C. FAILURE TO PROPERLY CROSS-EXAMINE WITNESSES {¶ 54} In this section, Russell contends that defense counsel's performance was rendered deficient by his failure to properly cross-examine certain witnesses presented by the State. Instead of damaging the State's case, Russell argues that the inartful cross-examinations by defense counsel actually bolstered the State's case by destroying Russell's alibi defense.
 {¶ 55} Trial counsel's decision to cross-examine a witness and the extent of such cross-examination are tactical matters. State v.Shells (Oct. 28, 2005), Montgomery App. No. 20802; See State v.Flors (1987), 38 Ohio App.3d 133, 139, 528 N.E.2d 950. Thus, decisions regarding cross-examination are within trial counsel's discretion and cannot form the basis for a claim of ineffective assistance of counsel.Id. (concluding that the extent of trial counsel's cross-examination is a matter of trial strategy and does not constitute ineffective assistance of counsel).
 {¶ 56} Russell initially points out that counsel's cross-examination of Hargrove simply rehashed answers to questions asked by the State during its direct examination. We disagree. Defense counsel's obvious strategy was to discredit Hargrove's testimony by depicting her as an amoral and opportunistic prostitute incapable of being trusted. He attempted to achieve this by having her repeat the sequence of events leading to Troutwine's murder as well as the events that occurred afterwards. In closing, defense counsel portrayed Hargrove as being driven by a desire to save herself by testifying against Russell. The questions he asked Hargrove during cross-examination allowed him to make this point.
 {¶ 57} With respect to the cross-examination of Officers Edward Zawodniak, Jeff Holmes, and Detective Whittaker regarding the procedures utilized to collect evidence from Troutwine's vehicle as well as the homicide scene, the State correctly points out that Russell's defense only required counsel to discredit the witnesses that placed him in Dayton, Ohio, on the day of the crime. Defense counsel's strategy was not to discredit the witnesses who testified that a murder had, in fact, occurred. Defense counsel's line of questioning with respect to the cross-examination of the officers was reasonable and does not rise to the level of ineffective assistance.
 {¶ 58} Next, Russell argues that counsel's cross-examination of Cory Dillard undermined his alibi defense by allowing the witness to reiterate his direct testimony that he observed Russell at 2080 Auburn Avenue on the date of the murder. Russell ignores the fact that his counsel attempted throughout the trial to implicate Dillard as the true murderer of Troutwine. Counsel had earlier elicited testimony from Hargrove that the gun used to kill Troutwine belonged to Dillard. In allowing Dillard to testify regarding his identification of Russell at the apartment on the day of the murder, counsel attempted to establish that Dillard was untruthful and had a reason to lie to protect himself from prosecution. Counsel did so by further attempting to point out inconsistencies in Dillard's testimony.
 {¶ 59} Defense counsel's cross-examination of Dillard's girlfriend, Danielle Richardson, was also designed to demonstrate that she had a motive to lie to protect her boyfriend. By allowing Richardson to repeat her testimony that Russell was at the apartment on the day of the murder, counsel was attempting to establish that she was willing to lie under oath to protect Dillard, whose child she had just given birth to a day before she testified. Simply put, Russell has failed to demonstrate that there is a reasonable probability that but for his counsel's cross-examination of certain State's witnesses at trial, the result of the case would have been different.
D) STIPULATING TO THE ABANDONMENT OF RUSSELL'S APARTMENT
 {¶ 60} As stated previously, Russell presented an alibi defense at trial. According to Russell he did not commit the murder of Troutwine because he was in Columbus, Ohio, assisting his estranged wife move into another residence. He claimed it was irrelevant that a murder had been committed in the apartment that he shared with Hargrove because he was out of town on the day said crime occurred. Thus, defense counsel's stipulation that the apartment had been abandoned and that the murder of Troutwine had been committed there does not amount to ineffective assistance. As noted previously, the record supports a finding that the apartment was, in fact, abandoned on the date of the search.
E. FAILURE TO OBJECT TO ADMISSION OF SPECULATIVE TESTIMONY AND
TESTIMONY ADMITTED WITHOUT FOUNDATION
F. FAILURE TO OBJECT TO NON-RESPONSIVE TESTIMONY
 {¶ 61} In this section, Russell argues that defense counsel's failure to object to Patti Troutwine's testimony regarding the contents of Troutwine's trunk as well as certain other of the deceased's habits amounts to ineffective assistance. Russell also contends that defense counsel's failure to object to Mrs. Troutwine's testimony regarding the state of her husband's body constituted ineffective assistance. Essentially, Mrs. Troutwine testified that because of the condition of Troutwine's corpse, the family was not able to provide a proper funeral.
 {¶ 62} While acknowledging that Troutwine's body was mistreated, defense counsel spent the balance of the trial attempting to prove that his client couldn't have committed the murder of Troutwine because he was out of town on the day the incident occurred. More importantly, defense counsel's strategy did not include attacking the distraught wife of the deceased victim on the stand. In all probability, such an action on the part of defense counsel would have turned the jury against him and greatly prejudiced his client. Thus, Russell is unable to overcome the "strong presumption" that defense counsel's performance constituted reasonable assistance. Many times, a proper course of action is more readily discernable in hindsight. In this instance, we will not attempt to second guess defense counsel's decision with respect to his trial strategy.
 {¶ 63} Russell's fourth assignment of error is overruled.
 V {¶ 64} Russell's fifth assignment of error is as follows:
 {¶ 65} "APPELLANT WAS DEPRIVED OF A FAIR TRIAL DUE TO PROSECUTORIAL MISCONDUCT."
 {¶ 66} In his fifth assignment, Russell argues that the State committed prosecutorial misconduct when it presented evidence of his sexual relationship with Hargrove which began when she only twelve years old.
 {¶ 67} The test for prosecutorial misconduct is whether the remarks were improper and, if so, whether they prejudicially affected the accused's substantial rights. State v. Smith (1984), 14 Ohio St.3d 13,14-15, 470 N.E.2d 883. The touchstone of the analysis "is the fairness of the trial, not the culpability of the prosecutor." Smith v.Phillips (1982), 455 U.S. 209, 219, 102 S.Ct. 940.
 {¶ 68} Russell makes no attempt to demonstrate how this line of questioning was so prejudicial such that the outcome of the case would have been different. Russell simply directs us to a portion of his argument in his fourth assignment of error. This is insufficient to convince us that any misconduct on the part of the State occurred.
 {¶ 69} Russell's fifth assignment of error is overruled.
 VI {¶ 70} Russell's sixth and final assignment of error is as follows:
 {¶ 71} "THE CUMULATIVE EFFECT OF THE ERRORS OCCURRING AT TRIAL DEPRIVED APPELLANT OF A FAIR TRIAL."
 {¶ 72} In his final assignment, Russell argues that the errors set forth in the previous assignments, when viewed cumulatively, denied him a fair trial and deprived him of due process. We have held that appellant's propositions fail to establish errors. State v.Moreland (1990), 50 Ohio St.3d 58, 69, 552 N.E.2d 894, 905. Thus, we fail to see how the absence of error can constitute cumulative error.Id.
 {¶ 73} Russell's sixth and final assignment of error is overruled.
 VII {¶ 74} All of his assignments having been overruled, the judgment of the trial court is affirmed.
WOLFF, P.J. and BROGAN, J., concur.