[Cite as *State v. Raines*, 2011-Ohio-3735.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

STATE OF OHIO                          :

    Plaintiff-Appellee            :            C.A. CASE NO.    24227

v.                                     :            T.C. NO.    10CR662

HOUBERT J. RAINES                      :            (Criminal appeal from
                                                    Common Pleas Court)
    Defendant-Appellant           :

                                       :

        . . . . . . . . . .

**O P I N I O N**

Rendered on the    29th   day of     July    , 2011.

. . . . . . . . . .

KIRSTEN A. BRANDT, Atty. Reg. No. 0070162, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

DANIEL R. ALLNUTT, Atty. Reg. No. 0085452, P. O. Box 234, Alpha, Ohio 45301
        Attorney for Defendant-Appellant

. . . . . . . . . .

DONOVAN, J.

{¶ 1}   This matter is before the Court on the Notice of Appeal of Houbert J. Raines, filed August 27, 2010.   On March 30, 2010, Raines was indicted on one count of aggravated robbery (deadly weapon), in violation of R.C. 2911.01(A)(1), with a firearm specification, and one count of aggravated burglary (deadly weapon), in violation of R.C. 2911.11(A)(2),

with a firearm specification. Both offenses are felonies of the first degree. Raines pled not guilty, and on April 20, 2010, he filed a motion to suppress. The trial court overruled the motion, after a hearing, and the Order provides that the court's rationale "was stated on record." On August 6, 2010, Raines pled no contest, and the trial court sentenced him to four years on each offense, to be served concurrently, and to three years on the merged firearm specifications, for an aggregate term of seven years.

{¶ 2} At the hearing on the motion to suppress, City of Dayton police officer Mitch Olmstead, who has been so employed for 18 years, testified that he was assigned to investigate the incident herein, which occurred at 903 Milburn Avenue. On March 4, 2010, Olmstead interviewed Raines at approximately 12:30 p.m. at the First District. Olmstead identified the pre-interview form that he used in the interview, and he testified that at the start of the process, he put the date, time and location of the interview in the upper right hand corner of the form. Olmstead stated that he read the entire form to Raines, and then he "drew lines next to each right," and as he read each right, he "had him answer out loud that he verbally understood them with a yes." According to his testimony, Olmstead then had Raines place his initials by each of the five rights to indicate his understanding thereof. Olmstead stated that he had Raines read the waiver of rights out loud and Raines indicated he understood the waiver. Olmstead then asked Raines how many years of school he had completed, and Raines wrote 11 years on the form. According to Olmstead, Raines signed the form and printed his name under his signature. Olmstead testified that he wrote Raines' identifying information in the upper left hand corner of the form and Raines placed his initials next to the identifiers, which included his name, address, social security number

and birthday. Officer Bill Herman was also in the room, and Olmstead testified that Herman signed the form, and then Olmstead signed the form.

{¶ 3} After the form was signed, Raines agreed to make statements to Olmstead. During the course of the interview, Olmstead asserted that Raines did not ask to terminate the process, nor did he ask for an attorney. Olmstead indicated that Raines did not appear to be under the influence of any alcohol or drugs, and he "understood every word I said to him." Olmstead stated that he did not threaten Raines or employ force at any point, and no promises were made in exchange for his statements. Olmstead stated that he did not withhold medical treatment from Raines. In addition to his oral statements, Raines provided a written statement to Olmstead. At the conclusion of the interview, Officer Herman took Raines to Grandview Hospital while Olmstead followed in a separate cruiser. According to Olmstead, Raines remained at the hospital for two to three hours before being released, and then he was booked into the Montgomery County Jail.

{¶ 4} Olmstead further testified that on March 8, 2010, he showed a photo spread to Ernie Gilbert, the victim herein, at the Safety Building. Detective Richie Davidson prepared the photo spread at Olmstead's request. Olmstead testified that he read the instructions for the photo spread to himself, and then he read them "verbatim" to Gilbert. Olmstead testified that when the photo spread was placed in front of him, Gilbert identified Raines as "the person who had robbed him, broken into his home." Gilbert circled, signed and dated Raines' photo, and then he signed the bottom of the paper, according to Olmstead. Olmstead identified the photo spread that he showed to Gilbert at the hearing. Olmstead stated that no one else was present when Gilbert identified Raines. Olmstead testified that

he did not in any way suggest to Gilbert which individual to choose in the photo spread.

{¶ 5} On cross-examination, Olmstead stated that he was advised of the incident herein by another officer, and he also received a call on his cell phone regarding the incident from an evidence crew. Olmstead stated that he came into contact with Raines at approximately 12:10 p.m. at the home of his parents, and he immediately noticed a large knot on Raines' forehead, as well as fresh blood on his face. Olmstead testified that Raines also "had some abrasions around his hand and some * * * small cuts on the back of his head." The lacerations "didn't appear to be very big, at all," and Olmstead stated that he did not believe that Raines was aware of them. Raines "never made reference to them," and Olmstead "never saw him paying any attention to them. I never saw him touching them. I never heard him complain about them." Olmstead stated that there was not very much blood on the back of Raines' head. Regarding the knot on his forehead, Olmstead stated that "it was swollen and there was a cut. And there was blood on his forehead that had run down onto his nose and blood had dried." Olmstead identified photos that were taken of Raines' injuries.

{¶ 6} According to Olmstead, the interview lasted "maybe an hour," and at its conclusion, Raines was taken to the hospital, at "1:30, two o'clock." Olmstead stated that Raines did not appear dazed in any way. In the course of the interview, according to Olmstead, Raines, "looked away and started laughing. And when I was repeating what he said to him, I told him - - I called him Hobie, * * * Hobie, you can tell you're lying; you know it yourself; you started to laugh and you're looking away; the rest of the time you were real serious and when you got to the part where you were lying to me, you started laughing."

After being confronted about lying, Raines "stood up and said all right you got me. And he said I'll tell you the complete truth. And he sat back down and we'd finished the first page and I slid the second page in front of him." Olmstead also wrote questions on paper, to which Raines wrote answers. Olmstead stated that he did not tell Raines how to answer the questions, and he did not tell him that he would take him to the doctor if he answered the questions in a certain way. Olmstead stated that, in addition to some sutures, he believed that Raines was given a CAT scan at the hospital. According to Olmstead, Raines was conscious throughout his treatment at the hospital.

{¶ 7} Regarding the photo spread, Olmstead stated that it contained six photos of different sizes, and that Raines was depicted in photograph no. 4. According to Olmstead, photograph nos. 4, 1 and 2 were of equal size and larger than photograph nos. 3, 5 and 6. Olmstead testified that he went over the instructions "very clearly," and when the photo spread was presented to Gilbert, he "didn't look at it very long * * * less than 30 seconds," before identifying Raines.

{¶ 8} On redirect examination, Olmstead testified that the incident at issue occurred at 3:44 a.m., and that several hours had passed between the time of the incident and when Olmstead made contact with Raines. According to Olmstead, Raines did not indicate that he had sought any type of medical care in the intervening hours.

{¶ 9} The trial judge asked Olmstead if he previously knew Raines, and Olmstead responded, "I had arrested him about a year ago, * * * for B and E. But I didn't really remember him."

{¶ 10} Raines' mother, Sally Raines, testified on behalf of her son. On the date of

the incident, Raines resided with Sally and his father at 731 North Keowee Street. According to Sally, she and her husband had doctor's appointments on March 4, 2010, and they woke up around 7:30 a.m. Upon entering their kitchen, Sally "saw my son in the kitchen drenched in blood. * * * I didn't know what had happened to him, where he'd been * * *. But I asked him, I said what in the world happened to you; who did this to you. And I asked him several times, repeatedly. He couldn't tell me anything. * * * it was like he was just looking at - - blank stare. * * * I tried to get him to sit down so I could clean the blood up and he just kind of was incoherent * * *." Sally and her husband decided to take Raines straight to the hospital at approximately 8:00 a.m. because he was nonresponsive and "couldn't form complete sentences." Sally testified that the area between Raines' eyes "looked like hamburger meat." She could not tell "how deep the cut was or how bad the cut was." Sally stated that most of Raines' jacket was covered in blood, as was the front of his shirt. There was also some blood on the floor that Sally later cleaned up. Sally stated that she was with Raines for "maybe half-hour or 45 minutes" before Olmstead arrived, and that Raines' demeanor did not improve during that time. When the officers arrived, Raines' father was guiding Raines out the back door to get into their truck, according to Sally.

{¶ 11} On cross-examination, Sally stated that Raines tried to speak to her "but just the words weren't making any sense." She stated that Olmstead and the other officers arrived at her home "around nine" in the morning. Raines "looked like he had a pretty good concussion," according to Sally.

{¶ 12} Raines also testified. He stated that he was 23 years old at the time of the hearing, and that he had never been convicted of a felony offense. When asked about his

injuries, Raines stated, "I don't really recall how they come to be about." He stated that he "had lacerations * * * between my eyes here (indicating). I had a approximately a one-inch gash on the left side of my head. It received seven staples. And another gash in the back of my head that received two staples." According to Raines, he told Olmstead and another officer that he was injured before he was placed in handcuffs at his mother's home, and he told them repeatedly that he was injured on the way to the station. Raines stated that he was interviewed in the "early daytime," and he testified that he was interviewed for "about an hour," during which time he asked for medical treatment. Raines stated that he did not recall what happened during the interview, and he did not recall the nature of his conversation with Olmstead. According to Raines, he was only concerned about getting medical treatment and representation. Raines testified that Olmstead promised to take him to the hospital if Raines answered his questions the "way he wrote them out." Initially, according to Raines, he answered the questions "to the best of my knowledge and he told me that I was lying." Then Raines "wrote "whatever I had to write to just get to the hospital. He told me you did this, this and this. I wrote down on the paper that." Raines testified that he was deprived of medical treatment, and that the only reason that he made statements to Olmstead was to get treatment.

{¶ 13} On cross-examination, when asked about the incident, Raines stated that he remembers "waking up and crawling home." Before the incident, Raines stated that he was "with a female," named Ashley Honshul, at his home on Keowee. According to Raines, Honshul "had stolen a family heirloom, a pistol, my grandfather had left me." Raines did not see her take the gun, but his grandmother, who also lives at that address, "seen her go out

my front door with a black case." Raines stated that he "went to retrieve it" at Honshul's residence at 903 Milburn Avenue. Raines testified that the last thing he remembers before waking up was the "first blow to my face with my revolver." Raines stated that he woke up "by the Pepsi Cola factory," and he was "in a snow embankment." Raines testified that he then crawled a block to his home. When he saw his mother and father in the kitchen, he "couldn't" tell them what happened. Raines stated that he felt disoriented and that he was "pretty much out of it." According to Raines, he has "no recollection of the time" when the officers responded.

{¶ 14} Regarding the pre-interview form, Raines testified that it "didn't really make sense to me but I nodded and initialed." Raines stated that Olmstead "wouldn't take me to the hospital until I completed" the form. When he was shown his written statements, Raines stated, "I was helped to write that statement, not physically but he helped me with the words." Regarding the conflicting statements that he gave, Raines stated that Olmstead told him what to write in both statements. Raines stated that he was told at the hospital that he had sustained a concussion, and he "couldn't remember the events." At the jail, Raines stated that he received Motrin for pain, and that his request to be placed in a "medical cell" was denied.

{¶ 15} The following exchange occurred between the trial judge and Raines:

{¶ 16} "THE COURT: "* * * your mother says that it was nine o'clock that the police took you from your house. And it was noon on the forms when you started this interview or somewhere around there. What happened from nine o'clock to noon?

{¶ 17} "THE WITNESS: Me and - - well I was sitting in the chair at First District

and were going over and over and over.

{¶ 18} "THE COURT: For three hours?

{¶ 19} "THE WITNESS: I couldn't say for three hours, sir."

{¶ 20} Dr. Craig A. Dues, who treated Raines at the hospital, testified. Dues identified Raines' medical records, which indicated that Raines had experienced a loss of consciousness after being injured. According to Dues, he "documented that there is a stellate, two centimeter laceration at the intraorbital region in the forehead as well as a two centimeter laceration to the * * * supraorbital left frontal region and a one centimeter laceration on the posterior scalp.

{¶ 21} "I go on to document that his pupils are equally round and reactive to light and accommodation." Dues testified that Raines' treatment "primarily involved repair of the wounds." For the wound between Raines' eyes, it "was anesthetized with some Lidocaine, one percent with Epinephrine. It was thoroughly cleansed and there was some 5.0 sutures placed, which are stitches." Dues stated that "it was a complex facial closure. * * * it was not a nice straight wound." Raines' two centimeter scalp wound "required six staples. Another scalp wound that was one centimeter in length required two staples." Dues documented that Raines was "alert and oriented." Dues diagnosed Raines with a "closed head injury," which is "a blunt force type trauma" in which there's no penetration into the skull. Dues stated that he ordered a CAT scan of the head, facial bones, and the C-spine for Raines. Dues testified that he "documented that there was no hemorrhage meaning no intracranial bleed. However, there is documented a scalp hematoma which means there was some type of blunt force trauma resulting in a scalp hematoma which is

collection of blood and some swelling under the skin." Dues stated that he "did not diagnose [Raines] with a concussion. However, based on my documentation, I have documented per his history that there was a loss of consciousness for two to three minutes which essentially tells me there was a traumatic brain injury." Dues further noted, however, that Raines had the highest, or best, score obtainable on his neurologic exam. Dues explained, Raines "did not have any altered sensorium, meaning he was alert, appropriate, oriented; his verbal response was appropriate; his motor response was appropriate; his eye opening was all appropriate * * * ." Dues testified, "the fact that he's in the emergency department and completely appropriate, you know assuming this happened at four o'clock, which is what he told me, and I'm seeing him at roughly 2 p.m., ten hours later, * * * he had a fairly minimal traumatic brain injury."

{¶ 22} On cross-examination, Dues stated that he was unable to verify that Raines lost consciousness, and that the history Raines provided was the sole basis for his diagnosis of a traumatic brain injury. Dues stated that Raines told him that he was hit in the face and head with a pistol at approximately 4:00 a.m., and Dues testified that Raines "obviously, remembered the event and he independently recalled that. He told me about it." Dues stated that Raines was discharged after spending two hours at the hospital.

{¶ 23} In overruling the motion to suppress, the trial court found that Raines was taken to the First District police station, where "at about 12:30," shortly after his arrival, he was advised of his *Miranda* rights with the use of a pre-interview form. The court found that Raines initialed each right and indicated that he had 11 years of schooling. The court found that Raines read the waiver of rights out loud and signed the form, and there were "no

threats or promises, no withholding of medical treatment. The record should reflect also that at the time the defendant was located, which was shortly before he was taken to the police department, although approximately eight hours after the event, that the defendant still had blood on his head. He had injuries on his skull. He had dried blood on his face and his clothing, The defendant had a large knot on his forehead, dried blood on his face and fresh blood on his face and on his hands. The officer indicated that the defendant did not appear to be dazed." The court noted that Raines made verbal and written statements to Olmstead.

{¶ 24} According to the trial court, at "one point the defendant was challenged by the officer. The officer indicated that he did not believe that the defendant was telling him the truth, and the defendant then continued to give statements which were different from the initial statement that he made."

{¶ 25} The court summarized the testimony of Raines' mother and found that her "story makes no sense whatsoever to the Court with regard to the timing. Either she is lying or sorely mistaken as to the timing of the events because she's either a couple hours off or intentionally she is trying to mislead by her testimony."

{¶ 26} The court also summarized Raines' testimony, and found "that his testimony is also inconsistent with the time line of the event and the time that he eventually was found by the police about eight hours later. And is inconsistent further with the testimony of Dr. Dues, who testified that on March the 4th, 2010, he was working at Grandview Hospital.

{¶ 27} "The chart was introduced as an exhibit, and the documentation in that chart is effectively undisputed. There's no doubt that the defendant needed sutures for a complex

facial closure, staples for a two-centimeter head wound and staples for a one-centimeter head wound.

{¶ 28} "The doctor did not diagnose him with a concussion * * * . The defendant was alert and oriented * * * . The doctor described it as a fairly minimal, if any traumatic brain injury. Mild to moderate injury was also the description he used."

{¶ 29} The trial court found it significant that Raines "was able to provide medical history and was able to provide information by independent recollection * * * and was perfectly alert and oriented" while at the hospital.

{¶ 30} Regarding Gilbert's identification of Raines in the photo spread, the court noted that Gilbert was read the instructions verbatim and there "were no suggestions made as to who the victim should identify." The court noted that the identification occurred on March 8, 2010. Having found that the presentation of the photo spread was not suggestive, the court noted that it "does not need to determine whether or not it's a reliable identification in any event," and the court determined that Gilbert's identification of Raines is admissible.

{¶ 31} Regarding Raines' statements, the court found that "there is no doubt that at the police station the defendant was in a custodial interrogation." The court found that Raines was adequately advised of his Miranda rights. According to the court, the "signing of a rights form is strong evidence, *North Carolina v. Butler*, of a knowing and intelligent waiver of the defendant's Miranda rights."

{¶ 32} The court found that Raines "was properly advised of his rights, knowingly and intelligently waived those rights; and although he had received an injury eight hours earlier, the Court [did] not find that there was anything unconstitutional about waiting until

after he was interviewed before he was taken" to the hospital.

{¶ 33} The court found that there was not a "nexus or a connection between the statements that the defendant made and his medical treatment. Medical treatment was not withheld until the defendant would make any statements. His condition, even at the hospital, was adequate to be interviewed."

{¶ 34} Finally the court found that Raines "did not seek medical treatment for eight hours before the police found him. It was not the Police department that did not have him seek medical treatment for that extended period of time before the interview."

{¶ 35} Raines asserts three assignments of error. We will consider his first and second assignments of error together. They are as follows:

{¶ 36} "THE APPELLANT'S CONFESSION GIVEN TO LAW ENFORCEMENT DURING HIS INTERROGATION BY OFFICER OLMSTEAD WAS NOT KNOWINGLY, VOLUNTARILY OR INTELLIGENTLY MADE, BECAUSE MEDICAL TREATMENT WAS WITHHELD IN A SUCCESSFUL ATTEMPT TO COERCE THE APPELLANT'S CONFESSION." And,

{¶ 37} "THE APPELLANT'S WAIVER OF HIS MIRANDA WARNINGS PRIOR TO HIS INTERROGATION BY OFFICER OLMSTEAD WERE NOT KNOWINGLY, VOLUNTARILY OR INTELLIGENTLY MADE, BECAUSE MEDICAL TREATMENT WAS WITHHELD TO COERCE HIM TO MAKING THE WAIVERS."

{¶ 38} According to Raines, he was "severely injured," and his injuries "gave law enforcement leverage to elicit a confession."

{¶ 39} "Appellate courts give great deference to the factual findings of the trier of

facts. (Internal citations omitted). At a suppression hearing, the trial court serves as the trier of fact, and must judge the credibility of witnesses and the weight of the evidence. (Internal citations omitted). The trial court is in the best position to resolve questions of fact and evaluate witness credibility. (Internal citations omitted). In reviewing a trial court's decision on a motion to suppress, an appellate court accepts the trial court's factual findings, relies on the trial court's ability to assess the credibility of witnesses, and independently determines whether the trial court applied the proper legal standard to the facts as found. (Internal citations omitted). An appellate court is bound to accept the trial court's factual findings as long as they are supported by competent, credible evidence. (Internal citations omitted)." *State v. Purser*, Greene App. No. 2006 CA 14, 2007-Ohio-190, ¶ 11.

{¶ 40} " 'The Fifth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution guarantee that no person in any criminal case shall be compelled to be a witness against himself. The concern that animated the framers to adopt the Fifth Amendment was that coerced confessions are inherently untrustworthy. (Citation omitted). "A free and voluntary confession is deserving of the highest credit, because it is presumed to flow from the strongest sense of guilt * * * but a confession forced from the mind by the flattery of hope, or by the torture of fear, comes in so questionable a shape * * * that no credit ought to be given it." ' " (Citation omitted). *State v. Jenkins*, Montgomery App. No. 24220, 2011-Ohio-754, ¶ 45.

{¶ 41} " '* * * The burden is on the prosecution to prove by a preponderance of the evidence that a defendant waived his *Miranda* rights voluntarily, knowingly, and intelligently. (Citation omitted).

{¶ 42} " '* * * The test is whether the [waiver] [is] voluntary under the totality of the circumstances, "including the age, mentality, and prior criminal experience of the accused; the length, intensity and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." (Citations omitted).

{¶ 43} " 'The totality of the circumstances analysis is triggered by evidence of police coercion.   (Citation omitted). "[C]oercive police activity is a necessary predicate to the finding" that a suspect involuntarily waived his *Miranda* rights and involuntarily confessed.   (Citation omitted).   A suspect's decision to waive his *Miranda* rights * * * [is] made voluntarily absent evidence that "his will was overborne and his capacity for self-determination was critically impaired because of coercive police conduct."   (Citations omitted).

{¶ 44} " 'The suspect's impaired mental condition at the time of the waiver and the confession has some bearing on the issue of the voluntariness but only as to whether police officers deliberately exploit the suspect's mental condition to coerce the waiver and confession." (Citation omitted).   *State v. Swopes*, Montgomery App. No. 24044, 2011-Ohio-2072, ¶ 32-35.

{¶ 45} " 'The line to be drawn between permissible police conduct and conduct deemed to induce or tend to induce an involuntary statement does not depend upon the bare language of inducement but rather upon the nature of the benefit to be derived by a defendant if he speaks the truth, as represented by police. * * * .' " *Jenkins,* ¶ 49.

{¶ 46} Having thoroughly reviewed the record, we conclude that the State

met its burden to prove by a preponderance of the evidence that Raines voluntarily, knowingly and intelligently waived his *Miranda* rights. The record is clear that Olmstead thoroughly went over Raines' *Miranda* rights and ascertained his understanding thereof individually. Raines initialed each right. Raines read the waiver of rights form out loud and indicated that he understood it. Raines signed the form, and Olmstead testified that Raines "understood every word I said to him."

{¶ 47} The record reflects that Rains was 23 years old at the time of the hearing, and that he completed 11 years of schooling. Raines testified that he had never been convicted of a felony. The length of his interview with Olmstead, "maybe an hour," was reasonable. The fact that Raines laughed in the course of the interview suggests that the interview was not of unreasonable intensity, and it further suggests that Raines was not as "severely injured" as he asserts herein. The trial court found Olmstead's testimony credible that he did not threaten Jenkins, make promises or withhold medical treatment in exchange for his statement, and we defer to the trial court's assessment of credibility. While Raines testified that he "couldn't remember the events," Olmstead testified that Raines did not appear to be dazed in the interview, and Dues' testimony regarding Raines' condition at the hospital, where Raines was taken immediately after the interview, supports Olmstead's testimony. Dues testified that Raines did not have a concussion, that he remembered being injured, that he had the highest possible score on his neurological examination, that he "did not have any altered sensorium, meaning he was alert, appropriate, oriented," with appropriate verbal and motor responses. Raines told Dues that he was injured at approximately 4:00 a.m., which is

consistent with Olmstead's testimony regarding when the incident occurred. Further, the record supports the trial court's conclusion that Raines himself failed to seek medical treatment in the intervening eight hours between the incident and arrest, lending credence to a finding that the injuries were not of such severity that necessitated law enforcement immediately transporting him to a hospital before conducting an interrogation.

{¶ 48} There is no evidence of police coercion before us. Since Raines voluntarily, knowingly and intelligently waived his *Miranda* rights, and since his confession was free and voluntary, Raines' first two assignments of error are overruled.

{¶ 49} Raines' third assignment of error is as follows:

{¶ 50} "THE TRIAL COURT'S DECISION THAT THE APPELLANT'S IDENTIFICATION IN THE PHOTO ARRAY WAS ADMISSIBLE WAS AN ABUSE OF DISCRETION, BECAUSE THE FORM OF THE ARRAY WAS SUGGESTIVE."

{¶ 51} According to Raines, the form of the photo spread "drew special attention" to his image because his photo was "significantly larger than half of the photographs."

{¶ 52} "In many cases, and in almost all cases in which the criminal offender is not known to his victim or other eyewitnesses and is not arrested at the time of the crime, those who witness the crime are asked to identify the perpetrator for purposes of police investigation through some form of confrontation. This confrontation may be in the form of a 'lineup,' a one-on-one 'show up,' or from a photograph or series of photographs displayed to the witness. When any of these

systems of confrontations suggest, due to the manner or mode of their presentation, that one individual is more likely than others to be the perpetrator of the crime, that fact increases the likelihood of misidentification and violates the right to due process of law of a defendant so identified. (Citation omitted). Identification testimony that has been tainted by an unduly or unnecessarily suggestive out-of-court confrontation may be suppressed on that basis." *State v. White* (Feb. 2, 1994), Montgomery App. No. 3057.

{¶ 53} " 'In order to justify suppressing a pretrial identification, a defendant must demonstrate (1) that the identification procedure used was so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification, and (2) that the identification in fact was unreliable under the totality of the circumstances. (Citations omitted). In other words, even if an identification procedure was overly suggestive, the identification remains admissible if sufficient evidence of reliability exists. A determination of reliability is unnecessary, however, where an identification procedure was not unduly suggestive.' " (Citations omitted.) *State v. Taylor,* Montgomery App. No. 22232, 2008-Ohio-6048, ¶ 12.

{¶ 54} Olmstead testified that he read the photo spread instructions to himself and then aloud "verbatim" to Gilbert. Gilbert readily identified Raines within 30 seconds, without difficulty. Gilbert circled Raines' photo, signed and dated it. Olmstead did nothing to suggest that Gilbert should identify Raines. The fact that three of the photographs in the array were larger than the other three does not render the photo array "so impermissibly suggestive" that there is a "very substantial likelihood of misidentification." See *State v. Foster* (Sept. 25, 1998),

Trumbull App. No. 97-T-0094, quoting *State v. Hill* (1987), 37 Ohio App.3d 10 (" ' * * * There is nothing in the record to indicate that the police officers in any way suggested to the witnesses looking at the photo array who should be chosen from the array. The mere fact that appellant's photograph was slightly larger and did not contain the same border as the other pictures is not sufficient to find that the identification procedure was impermissibly suggestive' "). There being no due process violation, Raines' third assigned error is overruled.

{¶ 55} The judgment of the trial court is affirmed.

. . . . . . . . . .

GRADY, P.J. and FAIN, J., concur.

Copies mailed to:

Kirsten A. Brandt
Daniel R. Allnutt
Hon. Mary L. Wiseman