[Cite as *State v. Simpson*, 2013-Ohio-1696.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | Appellate Case No. 25163 |
| Plaintiff-Appellee | : | |
| | : | Trial Court Case No. 2010-CR-4101 |
| v. | : | |
| | : | |
| KERON SIMPSON | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

· · · · · · · · · · ·

O P I N I O N

Rendered on the 26th day of April, 2013.

· · · · · · · · · · ·

MATHIAS H. HECK, JR., by KIRSTEN A. BRANDT, Atty. Reg. #0070162, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, P.O. Box 972, 301 West Third Street, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellee

JON PAUL RION, Atty. Reg. #0067020, and NICOLE RUTTER-HIRTH, Atty. Reg. #0081004, Rion, Rion & Rion, L.P.A., Inc., 130 West Second Street, Suite 2150, Post Office Box 1262, Dayton, Ohio 45402
    Attorney for Defendant-Appellant

· · · · · · · · · · · ·

HALL, J.

{¶ 1}    Keron D. Simpson appeals from his conviction and sentence on multiple

counts of aggravated robbery, felonious assault, grand theft, theft, and accompanying firearm specifications.

{¶ 2}  Simpson advances four assignments of error on appeal. First, he contends the trial court erred in overruling his motion to suppress photo identifications as unreliable. Second, he challenges the legal sufficiency and manifest weight of the evidence to support his convictions. Third, he asserts that the trial court erred in imposing a statutorily prohibited consecutive sentence. Fourth, he maintains that the trial court erred in not declaring a mistrial after jurors saw him in police custody.

{¶ 3}  The record reflects that Simpson was charged with the above-mentioned crimes based on his participation in the theft of an ATV and two dirt bikes in December 2010. Prior to trial, Simpson pled no contest to charges related to the theft of the ATV, which belonged to Joshua Nuttall. Simpson proceeded to trial on charges related to the theft of the two dirt bikes, one of which belonged to the fifteen-year-old son of David Nishwitz. The other dirt bike belonged to Christopher Voudris.

{¶ 4}  At trial, the State presented evidence that Nishwitz had listed his son's dirt bike, a red Honda with custom handlebars, for sale on Craigslist. On December 22, 2010, Nishwitz's son received a call from an interested party. After additional discussions over the phone, Nishwitz agreed to take the dirt bike to the potential buyer. He drove with his son to an address on Theodore Avenue in Dayton. When he arrived, Nishwitz saw two males standing near an open garage door. Nishwitz identified Simpson at trial as being the taller and older of the two males. According to Nishwitz, he unloaded the dirt bike from its carrier and allowed the younger male to sit on it. After showing Nishwitz some cash, Simpson excused himself to go inside to get more money. While waiting for Simpson's return, Nishwitz allowed the

younger male to ride the dirt bike to a stop sign. The younger male rode to the stop sign, kept going, and never returned. Simpson also never returned. Nishwitz reported the incident to the police. On January 4, 2011, he identified Simpson from a photo spread as being the person who displayed the money when his son's dirt bike was stolen.

{¶ 5}    The State's evidence established that Voudris also had listed his dirt bike for sale on Craigslist. On December 22, 2010, Voudris started receiving calls from an interested party. The following day, he exchanged more calls with the potential buyer. Voudris agreed to take the dirt bike to 5229 Gardendale Avenue to meet the prospective purchaser. Voudris and his girlfriend, Brittney Stickelman, drove to that location with the dirt bike in the back of their pick-up truck. Once there, Voudris saw two males standing outside. Voudris identified Simpson at trial as being the taller and older of the two males. The younger male was sitting on a red Honda dirt bike with custom handlebars. Stickelman remained in the truck obscured behind tinted windows where she could not be seen.

{¶ 6}    Voudris approached Simpson and the younger male. Simpson and Voudris initially examined the dirt bike together in the truck bed. After Simpson displayed some cash, Voudris agreed to unload the bike and start it. Voudris drove the dirt bike for the men and discussed it with them. At Simpson's urging, Voudris started the dirt bike again. Simpson then pulled out a black, semi-automatic handgun and pointed it at Voudris's face. Simpson fired the gun, but it jammed. Voudris responded by throwing down the bike and telling Simpson to take it. When Simpson went for the bike, the clip fell out of his gun. Voudris immediately grabbed Simpson, who was reloading the clip and yelling for the younger male to shoot Voudris. The younger male pulled out a silver handgun and pointed it in the air. Simpson then pointed his reloaded pistol at Voudris's face. Simpson told him, "You're done. You're done."

Simpson then mounted Voudris's dirt bike, shot Voudris in the face, and drove away followed by the younger male. Stickelman drove Voudris to a nearby location where they met police. Voudris was taken to the hospital for treatment. Four days later, he identified Simpson from a photo spread. He reported being "110 percent" sure of the identification. Shortly thereafter, Stickelman also identified Simpson from a photo spread as being the person who shot Voudris in the face. Like Voudris, she identified him at trial as well.

{¶ 7}    Police investigating the crime found two sets of shoe prints in the snow in the bed of Voudris's pick-up truck. The tread pattern on boots discovered in Simpson's bedroom closet matched one set of prints in the truck bed. In addition, when Simpson was arrested, he was wearing a black coat with a fur-lined hood. Voudris and Stickelman described the coat as looking like the one the shooter had worn. Finally, the State presented evidence of multiple calls between Simpson's cell phone and Nishwitz's phone just before Nishwitz's son's dirt bike was stolen. The State also presented evidence of multiple calls between Simpson's cell phone and Voudris's phone just before the shooting of Voudris and the theft of his dirt bike.

{¶ 8}    Based on the evidence presented, a jury found Simpson guilty of all charges against him. After merging certain counts, the trial court imposed concurrent prison terms totaling eight years. The trial court imposed an additional three-year term for merged firearm specifications, resulting in an aggregate eleven-year prison sentence. The trial court ordered this sentence to be served consecutively to the sentence imposed on Simpson in two other cases.[1] This appeal followed.

{¶ 9}    In his first assignment of error, Simpson contends the trial court erred in

---

[1]In one of those cases, Simpson already had received a sentence of thirty-three years to life in prison on multiple charges of aggravated robbery and murder. *See State v. Simpson*, Montgomery C.P. No. 2011 CR 01356/01 (Feb. 29, 2012).

overruling his motion to suppress several photo-spread identifications as unreliable. He raises four arguments in support. First, he claims the photo spreads were suggestive because a detective manipulated the pictures by drawing on them. Second, he complains that the photo spreads containing his picture were unduly suggestive because his picture was larger than the others. Third, he argues that the photo spreads shown to multiple witnesses had him in the same place each time, giving the witnesses an opportunity to advise one another of his position. Fourth, he asserts that the photo spreads were presented by an administrator who was not "blind" or "blinded" as required by statute.

{¶ 10} "When a witness has been confronted with a suspect before trial, due process requires a court to suppress the witness's identification of the suspect if the confrontation was unnecessarily suggestive of the suspect's guilt and the identification was unreliable under the totality of the circumstances." *State v. Harris*, 2d Dist. Montgomery No. 19796, 2004-Ohio-3570, ¶19. "The defendant must first show that the identification procedure was unduly suggestive. If the defendant meets that burden, the court must then consider whether the identification, viewed under the totality of the circumstances, is reliable despite the suggestive procedure. If the pretrial confrontation procedure was not unfairly suggestive, any remaining questions as to reliability go to the weight of the identification, not its admissibility, and no further inquiry into the reliability of the identification is required." (Citations omitted.) *Id.*

{¶ 11} With regard to the use of a "blind" or "blinded" administrator, R.C. 2933.83(B) "requires any law enforcement agency or criminal justice entity that conducts live lineups and photo lineups to adopt specific procedures for conducting the lineups." *State v. Ruff*, 1st Dist. Hamilton No. C-110250, 2012-Ohio-1910, ¶ 5. These procedures include, inter

alia, using "a blind or blinded administrator" to conduct a photo lineup. R.C. 293383(B)(1). Under R.C. 2933.83(C)(1), evidence of a failure to comply with the required protocol "shall be considered by trial courts in adjudicating motions to suppress eyewitness identification resulting from or related to the lineup." Failure to comply with the blind- or blinded-administrator requirement, however, does not provide an independent basis for suppression. Instead, the penalty for failure to comply with R.C. 2933.83 is that "the jury shall be instructed that it may consider credible evidence of noncompliance in determining the reliability of any eyewitness identification." *State v. Stevenson*, 2d Dist. Montgomery No. 24821, 2012-Ohio-3396, ¶16.

{¶ 12} With the foregoing standards in mind, we see no error in the trial court's denial of Simpson's motion to suppress.[2] The first photo spread at issue was shown to three witnesses in connection with the theft of Nuttall's ATV. Detective Krista Gorsuch obtained the six-picture photo spread from another detective who had created it. At Gorsuch's request, a third detective, Rick Oakley, agreed to present the photo spread to the witnesses. (Tr. Vol. I at 76). Oakley was unfamiliar with Simpson and had no cases involving him. (*Id*. at 77, 80). Although Gorsuch remained in the back of the room while Oakley presented the photo spread, she stayed in a corner behind the witnesses and did nothing verbally or non-verbally to involve herself in the process. (*Id*. at 98-100).

{¶ 13} Simpson complains that Oakley did not qualify as a "blind administrator" because Gorsuch remained in the back of the room. Under R.C. 2933.83(A)(2), a "blind administrator" is defined as an administrator "who does not know the identity of the suspect."

---

[2]We note that the record contains a thorough explanation of the trial court's suppression ruling. (Tr. Vol. I at 180-192).

Simpson has failed to identify anything in the statute that made Oakley a non-blind administrator merely by virtue of Gorsuch's presence in the room. In any event, on this record we find that Gorsuch's presence had no effect on the witnesses' identification because she sat behind them and did not say or do anything.

{¶ 14} Simpson additionally complains that Oakley failed to complete part of the paperwork required by R.C. 2933.83(A)(2). As the State points out, however, the paperwork pertained to two witnesses who failed to pick Simpson out of the photo spread. (Appellee's brief at 16; Tr. Vol. I at 96). Because these witnesses *did not* identify Simpson, Oakley's failure to complete the omitted paperwork is immaterial.[3]

{¶ 15} We also see nothing unduly suggestive about the photo spread used by Gorsuch. Although Simpson complains that his image is larger and closer than the image in the other five photos, this did not render the array unduly suggestive. The mere fact that a defendant's photo is slightly larger, as is the case here, does not make the identification procedure impermissibly suggestive. *State v. Raines*, 2d Dist. Montgomery No. 24227, 2011-Ohio-3735, ¶54; *see State v. Kidd*, 2d Dist. Greene No. 96 CA 62, 1997 WL 381179, *12 (July 11, 1997) ("While it is true that Kidd's photograph was taken at a slightly closer range, the background of her photograph is somewhat lighter than the others, and her head is a little tilted, we do not believe that this made the photo spread so impermissibly suggestive as to give rise to a substantial likelihood of irreparable misidentification."). The lack of suggestiveness of the photo spread used by Gorsuch is further evidenced by the fact that the three witnesses who viewed it in connection with the theft of Nuttall's ATV all identified

---

[3]The statute is intended to ensure reliable photo identifications. Where no identification of the defendant occurs, a statutory violation cannot be prejudicial.

different people as the perpetrator. This fact refutes Simpson's additional argument that the witnesses may have advised one another about his position in the photo spread.

{¶ 16} Simpson next challenges the photo spread shown to witnesses in connection with the shooting of Voudris and the theft of his dirt bike. After creating this photo spread, detective Troy Dexter asked sergeant Anthony Ashley to show it to Voudris. (Tr. Vol. I at 10). Ashley was not familiar with the crime and did not recognize anyone in the photo spread. (*Id*. at 11, 31, 42). Dexter also did not tell Ashley who the suspect was in the case. (*Id*.). Dexter waited in another room while Ashley presented the array to Voudris, who identified Simpson. (*Id*. at 11-12, 36, 50). Several days later, Dexter asked sergeant Jay Vitali to show the same photo spread to Stickelman with the pictures randomly shuffled. Vitali was not familiar with the case or anyone depicted in the photo spread. (*Id*. at 157, 163-164, 167). Vitali showed the array to Stickelman in an office where they were alone. (*Id*. at 170). Stickelman identified Simpson. Having reviewed the record, we believe Ashley and Vitali qualified as "blind administrators" within the meaning of R.C. 2933.83(A)(2).

{¶ 17} Although Simpson complains that Dexter manipulated the photos in the array by drawing hats on them, the record reveals that he did so to make them more uniform. Dexter explained that he was concerned because Simpson had an irregular scar on his hairline where hair would not grow. He feared that leaving the scar uncovered would attract attention to Simpson's photo. To prevent such an occurrence, he used a marker to draw hats on all of the individuals in the photo spread. (*Id*. at 11-12, 20). We see nothing about the drawn hats that rendered the photo spread suggestive. By covering Simpson's scar and hairline, Dexter made the array less suggestive. If Dexter had not covered the scar and hairline, Simpson could have argued, as he did in another recent case, that the visibility of the scar rendered the photo

spread suggestive. *See State v. Simpson*, 2d Dist. Montgomery No. 25069, 2013-Ohio-1072, ¶39 ("Simpson asserts that Rose should have covered Simpson's unique scar when she assembled the photo spreads, and that in failing to do so, she singled out his photo.").

{¶ 18} Finally, Simpson has provided us with his own jury instruction concerning non-compliance with R.C. 2933.83. (Appellant's brief at 15). He argues that the trial court erred in not giving the instruction in his case. We find this argument unpersuasive for at least two independent reasons. First, we concluded above that Simpson failed to demonstrate any material non-compliance with the statute. Therefore, an instruction on non-compliance was not warranted. Second, he fails to identify anywhere in the record where he requested the instruction contained in his appellate brief. For both of these reasons, we cannot say the trial court erred in failing to give the instruction. The first assignment of error is overruled.

{¶ 19} In his second assignment of error, Simpson challenges the legal sufficiency and manifest weight of the evidence to support his convictions for theft, grand theft, aggravated robbery, and felonious assault in connection with the Nishwitz and Voudris incidents. With regard to the sufficiency of the evidence, Simpson's entire argument is as follows:

> In this case, Appellant was linked to the Nishwitz and Voudris crimes based upon investigations by the Dayton Police Department for other thefts; it was not DNA nor any other scientific link. In fact, the fingerprints found did not belong to Appellant. Based upon a hunch of Appellant's involvement, the Dayton police department created [a] photo spread. Appellant's photo was larger and closer up than the other photos in the spread. This overly suggestive lineup was then passed around the police department to be shown to multiple

witnesses.

In the Voudris case, the one witness, Britt[ne]y [Stickelman], could not recall who shot Appellant [sic]. She did not see who shot Voudris, she could hardly see the scuffle that ensued, and could not even identify the house where this occurred. Voudris "believed" Appellant was the person who shot him. At the time the identifications were made, he was on medication which caused him to mis-identify Appellant's co-defendant; he was on this same medication when viewing Appellant's lineup. Then a search of Appellant's residence yielded boots and a jacket which match those worn by the suspect. This attire is actually common, worn by many young men in the winter. The phone used in arranging the meetings belonged to Rob Taylor. There were multiple men making the calls from that number to arrange the meeting.

In the Nishwitz matter, the witnesses identified Appellant again based upon the photo spread. The victim and administrator even admitted Appellant's photo was distinguishable. Again, there were multiple men making the calls from that number to arrange the meeting and that phone was registered to Rob Taylor.

These inconsistencies, coupled with the other errors regarding the photo lineup, should have been considered by the trial court in consideration of Appellant's Rule 29 motion. The trial court failed to consider these facts on the record and for that reason, denial of the Rule 29 motion was improper.

(Appellant's brief at 16-17).

{¶ 20} Simpson repeats the foregoing arguments in challenging the manifest weight

of the evidence to support his convictions. (*Id.* at 18).

{¶ 21} When a defendant challenges the sufficiency of the evidence, he is arguing that the State presented inadequate evidence on an element of the offense to sustain the verdict as a matter of law. *State v. Hawn*, 138 Ohio App.3d 449, 471, 741 N.E.2d 594 (2d Dist.). "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 22} Our analysis is different when reviewing a manifest-weight argument. When a conviction is challenged on appeal as being against the weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541. A judgment should be reversed as being against the manifest weight of the evidence "only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.).

{¶ 23} With the foregoing standards in mind, we conclude that Simpson's convictions are supported by legally sufficient evidence and are not against the weight of the evidence. The record reflects that Nishwitz identified Simpson in a photo spread as being one

of the two individuals involved in the theft of his son's dirt bike. Four days after being shot in the face, Voudris likewise identified Simpson in a photo spread as being one of the two individuals involved in the theft of his dirt bike. Stickelman also identified Simpson in a photo spread as being the person who shot Voudris in the face. Nishwitz, Voudris, and Stickelman also identified Simpson in person at trial.

{¶ 24} The foregoing identifications were not the only evidence that established Simpson's guilt. Police investigating the shooting of Voudris and the theft of his dirt bike saw two sets of shoe prints in the snow in the bed of his truck, where he had transported the bike. Following Simpson's arrest, police found a pair of Timberland boots in his closet. The tread pattern on the boots matched one set of prints in the back of Voudris's truck. This evidence tends to prove that Simpson was the person who had helped Voudris remove the dirt bike from the truck bed before shooting Simpson and stealing the bike. In addition, when Simpson was arrested, he was wearing a distinctive black coat with a fur-lined hood. Voudris and Stickelman identified the coat as looking like the one the shooter had worn.

{¶ 25} The State also presented compelling cell-phone evidence that tends to establish Simpson's guilt. When Simpson was arrested, police found a Cincinnati Bell wireless telephone in his coat pocket. Subscriber information for the phone included the date "5/21/91," which was Simpson's date of birth. (Tr. Vol. IV at 931; Vol. V at 1009). Police also found a picture of Simpson and his girlfriend on the phone. (Tr. Vol. IV at 933-934). This evidence tends to establish that Simpson owned the phone found in his pocket. Notably, the State presented evidence of multiple calls between Simpson's phone and Nishwitz's phone just before Nishwitz's son's dirt bike was stolen. The State similarly presented evidence of multiple calls between Simpson's phone and Voudris's phone just before the shooting of

Voudris and the theft of his dirt bike. These phone calls constituted strong circumstantial evidence that Simpson was one of the two men involved in the crimes.

{¶ 26} Simpson's contrary arguments fail to persuade us that his convictions are based on legally insufficient evidence or are against the weight of the evidence. The State was not required to provide DNA or fingerprint evidence linking Simpson to the crimes. As for the allegedly suggestive nature of the photo spreads and the allegedly unreliable identifications, we addressed Simpson's argument regarding suggestiveness in our resolution of his first assignment of error. We need not repeat that analysis here. Having reviewed the record, we are equally unpersuaded that the positive photo identifications of Simpson were unreliable. Although Stickelman was initially hysterical and provided little useful information, she later gave police a physical description of the suspects and picked Simpson out of a photo spread. As for Voudris, he denied at trial that his pain medication had any effect on his identification of Simpson. (Tr. Vol. III at 662-663). Voudris stated with "110 percent" certainty that Simpson was the person who pulled a gun on him. He was "almost positive" that Simpson actually shot him, but he could not say with absolute certainty which of the two perpetrators fired the shot. (*Id*. at 667-668). In any event, the weight to be given to the identifications was for the jury to decide.

{¶ 27} Although Simpson also complains that many people wear boots and jackets like his, we find it relevant that his jacket matched a description of the jacket worn by one of the two perpetrators and that the tread on his boots matched a print left in the bed of Voudris's truck. Finally, the jury reasonably could have rejected Simpson's argument that the cell phone found in his pocket belonged to someone else. Although the name "Rob Taylor" had been used when the phone was activated, Cincinnati Bell did not verify the information because the

phone was prepaid. In any event, the person activating the phone entered Simpson's birthday, "5/21/91," as the subscriber's date of birth. As set forth above, police also found a picture of Simpson and his girlfriend on the phone, which was discovered in his coat pocket. In light of this evidence, the jury reasonably could have concluded that the phone belonged to Simpson or that Simpson was the user of the phone on the dates in question.

{¶ 28} Having reviewed the record, we believe a rational trier of fact could have found Simpson guilty of the crimes at issue. The evidence does not weigh heavily against his convictions. The second assignment of error is overruled.

{¶ 29} In his third assignment of error, Simpson asserts that the trial court erred in imposing a prohibited consecutive sentence. Although the trial court imposed concurrent sentences on each count (except for a consecutive three years on a firearm specification), it ordered Simpson's sentence to be served consecutive to sentences he was serving in other cases. Simpson argues, however, that at the time of his sentencing in this case, R.C. 2929.41(A) prohibited consecutive sentences.

{¶ 30} Upon review, we find our recent opinion in *State v. Hess*, 2d Dist. Montgomery No. 25144, 2013-Ohio-10, to be dispositive. In *Hess*, we considered and rejected the argument Simpson advances. We noted that R.C. 2929.41(A) provided for concurrent sentences subject to certain referenced exceptions, one of which was identified as R.C. 2929.14(E). *Id.* at ¶8. We found R.C. 2929.41(A)'s reference to R.C. 2929.14(E) to be a typographical error, noting that the pertinent exception allowing consecutive sentences actually is found in R.C. 2929.14(C).[4] *Id.* at ¶13. We rejected the defendant's argument that

---

[4] Effective September 28, 2012, the General Assembly corrected the improper reference to R.C. 2929.14(E), and R.C. 2929.41(A) now refers to R.C. 2929.14(C).

we had to apply R.C. 2929.41(A) as written, despite the obvious typographical error. We reasoned: "In this case, it is clear that the Ohio legislature intended to reference R.C. 2929.14(C), rather than R.C. 2929.14(E). We will not employ the rule of lenity to defeat the obvious intention of the legislature." *Id.* at ¶18.

{¶ 31} In the present case, the trial court likewise found that R.C. 2929.41(A) contained a clerical error and that it could impose a consecutive sentence. (Tr. Vol. V at 1167-1169). On the authority of *Hess*, which is directly on point, we find no error in the trial court's ruling.

{¶ 32} In a separate and unrelated argument under his third assignment of error, Simpson contends the trial court erred in accepting his no-contest plea to the theft charges involving Joshua Nuttall's ATV. The record reflects that Simpson plead no contest to felony theft of a motor vehicle and misdemeanor theft with regard to the ATV. Before accepting Simpson's plea to these charges, the trial court advised him of various things, including the maximum potential penalty he faced. Simpson notes on appeal, however, that the trial court failed to tell him it could order his sentence on these charges to be served consecutive to the sentences he already was serving in other cases. Because the trial court did not advise him of this possibility, Simpson claims his no-contest plea was invalid. In support, he argues that the requirement to advise a defendant of the maximum potential penalty necessarily includes informing him of the potential for consecutive sentences.

{¶ 33} Simpson's argument lacks merit. While a trial court must inform a defendant of the "maximum penalty" he faces on a particular charge, it has no constitutional or statutory obligation to advise him of the potential for consecutive sentencing. *State v. Johnson*, 40 Ohio St.3d 130, 532 N.E.2d 1295 (1988); *State v. Smith*, 2d Dist. Montgomery No. 22206,

2007-Ohio-6904, ¶8. Although *Johnson* and *Smith* involved consecutive sentences on multiple counts in one case, the same rationale applies where, as here, a trial court orders its sentence to be served consecutive to a sentence already imposed in another case. Accordingly, the third assignment of error is overruled.

{¶ 34} In his fourth assignment of error, Simpson maintains that the trial court erred in not declaring a mistrial after jurors saw him in custody. Although he was not handcuffed, Simpson asserts that jurors saw him multiple times accompanied by deputies who were "controlling" him. He argues that this observation of him constituted an irregularity in the proceedings and deprived him of a fair trial.

{¶ 35} The record reveals two instances where prospective jurors or actual jurors saw Simpson outside the courtroom in the presence of deputies. On the first occasion, an assistant prosecutor observed Simpson walk across a hallway accompanied by two deputies. In the assistant prosecutor's opinion, Simpson and the deputies were in the line of sight of about a half-dozen prospective jurors. The deputies were not touching Simpson, who was unrestrained and was wearing street clothes. The trial court overruled a motion for a mistrial, finding that the prospective jurors' observation of Simpson did not deprive him of a fair trial. (Tr. Vol. II at 264-271).

{¶ 36} On the second occasion, Simpson voiced concern that three jurors had seen him standing outside an elevator accompanied by two deputies. (Tr. Vol. IV at 818-819). Once again, Simpson was unrestrained and was wearing street clothes. (Tr. Vol. IV at 883; Tr. Vol. V at 948).The trial court identified the three jurors and questioned them separately. The first juror explained that he was riding the elevator and saw Simpson and one deputy standing in the hallway when the doors opened. He assured the court that the observation would have no

impact on his decision, and the trial court told him not to discuss the matter with other jurors. (Tr. Vol. V at 952-953). The second juror stated that she also was on the elevator and saw Simpson when the doors opened. From her vantage point, however, she could not see anyone with him. (*Id*. at 957-958). The third juror, who was an alternate and did not participate in deliberations, had no recollection of seeing Simpson outside the courtroom at all. (*Id*. at 959-960). In light of these facts, the trial court again denied a motion for a mistrial, finding that Simpson had not been deprived of a fair trial. (*Id*. at 963-966). As a cautionary measure, however, the trial court instructed the jury prior to deliberations it was not to be influenced by anything heard or seen outside the courtroom. (Id. at 966, 1145).

{¶ 37} "The decision whether to grant a mistrial lies within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion." *State v. Williams*, 2d Dist. Montgomery No. 22126, 2008-Ohio-2069, ¶30. We see no abuse of discretion in the trial court's denial of a mistrial here. "A mistrial should only be declared when a fair trial is no longer possible." *State v. Nelson*, 2d Dist. Montgomery No. 25026, 2012-Ohio-5797, ¶25. The trial court acted reasonably, and therefore did not abuse its discretion, in finding that brief observations of deputies with Simpson, while he was unrestrained and in street clothes, did not deprive him of a fair trial. *Compare State v. Williams*, 2d Dist. Montgomery No. 22126, 2008-Ohio-2069, ¶38-42 (finding no abuse of discretion in the denial of a mistrial where jurors saw deputies leading the defendant, who was handcuffed, back to jail with other inmates who were handcuffed and wearing jail clothes). The fourth assignment of error is overruled.

{¶ 38} The judgment of the Montgomery County Common Pleas Court is affirmed.

. . . . . . . . . . . . .

FAIN and WELBAUM, JJ., concur.

Copies mailed to:

Mathias H. Heck
Kirsten A. Brandt
Jon Paul Rion
Nicole Rutter-Hirth
Hon. Michael Tucker