[Cite as *State v. Boyd*, 2014-Ohio-5571.]

IN THE COURT OF APPEALS FOR CLARK COUNTY, OHIO

STATE OF OHIO                                    :

    Plaintiff-Appellee                      :         C.A. CASE NO.     2012 CA 85

v.                                               :         T.C. NO.     12CR413

DANIEL BOYD                                      :          (Criminal appeal from
                                              Common Pleas Court)
    Defendant-Appellant                     :

                                                 :

· · · · · · · · · ·

**O P I N I O N**

Rendered on the _____19th_____ day of _____December_____, 2014.

· · · · · · · · · ·

RYAN A. SAUNDERS, Atty. Reg. No. 0091678, Assistant Prosecuting Attorney, 50 E. Columbia Street, Suite 449, Springfield, Ohio 45502
      Attorney for Plaintiff-Appellee

GREGORY K. LIND, Atty. Reg. No. 0055227, One S. Limestone Street, Ground Floor, Suite D, Springfield, Ohio 45502
      Attorney for Defendant-Appellant

· · · · · · · · · ·

DONOVAN, J.

{¶ 1}    This matter is before the Court on the Notice of Appeal of Daniel Boyd, filed November 20, 2012.  Boyd was convicted on October 30, 2012, following a trial by jury, on one count of burglary, in violation of R.C. 2911.12(A)(3), a felony of the third degree.  The trial court imposed a sentence of three years.  We hereby affirm the judgment of the trial court.

{¶ 2}    On April 22, 2013, appointed appellate counsel for Boyd filed a brief pursuant to *Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967), asserting an inability to find meritorious issues for appeal.  This Court granted Boyd 60 days to file a pro se brief, and he did so, asserting seven assignments of error.  Boyd also filed a reply brief.  On January 27, 2014, this Court issued a decision that provides that "we have discovered several non-frivolous issues having arguable merit.  Specifically, we have uncovered several instances where hearsay testimony was admitted, sometimes over the objection of defense counsel, sometimes not."  This Court further noted "that defense counsel failed to file a motion to suppress regarding the photo array compiled by Officer Smith used to identify Boyd as being present at the location wherein the burglary occurred * * *."  Finally, this Court concluded that "one or more of the seven assignments of error advanced by Boyd in his pro se appellate brief are arguably meritorious and deserve further attention."  This Court set aside appointed counsel's *Anders* brief and appointed new counsel to represent Boyd on appeal.

{¶ 3}    The record reflects that Boyd was indicted on June 11, 2012 on two counts of burglary, in violation of R.C. 2911.12(A)(2), and alternatively, in violation of R.C. 2911.12(A)(3).  Boyd was arrested on June 28, 2012, and he subsequently entered a plea of

not guilty. On October 12, 2012, Boyd filed a Notice of Alibi which provides that on "the date of the alleged burglary April 18, 2012 between the hours of 4:00p.m. to 9:00pm, the Defendant was with Justin Cydrus playing darts at Fricker's, 1616 Upper Valley Pike, Springfield, Ohio."

{¶ 4} At the October 25, 2012 trial, Derek Smith testified that in mid-April, 2012, he was the Chief of the South Charleston Police Department. He stated that on April 19, 2012, he was dispatched to 355 Clifton Road, Apartment 32, at "about 8:07 in the morning," on the report of a burglary. According to Smith, "[u]pon arrival, I met the victim, Ryan Midkiff, he informed me that someone had broken into his apartment on April 18th, the day before, sometime between 4:45 p.m. and 9:30 p.m. He stated that several items were missing from his apartment, an X-Box 360, white in color, * * * a Play Station 2 game console and approximately $200 in cash." Smith stated that he observed signs of forced entry, namely "heavy damage to the door frame. It certainly appeared to me as if the door was locked and someone had kicked it in, broke the door frame and the locking mechanism of the door." Smith stated that he "noticed glass all over the floor as if a glass jar had been broken on the floor and the area where the gaming devices were, were just cables laying on the table."

{¶ 5} Smith stated that in the course of his investigation, he "canvassed the area to see if anybody had heard or seen anything suspicious the day before," and that in doing so, he spoke to Thomas Bowen, whose apartment "is directly across from the victim's apartment." Smith stated that Bowen "informed me that he actually did see two individuals come through the fence of the apartment complex that's next to Pine Village." The

following exchange occurred:

MR. HAMMOND: I'm going to object to the hearsay in this case.

MR. DRISCOLL: Your Honor, I believe it goes not so much to the truth of the matter asserted but as to what steps Officer Smith took to further the investigation.

THE COURT: All right. Overruled.

BY MR. DRISCOLL: Thank you. Go ahead.

A. Mr. Bowen informed me that he witnessed two male individuals come from the apartment complex next to the victim's complex through the fence. He said that he immediately became aware of them because of how they were dressed.

He said they were wearing hooded sweatshirts with shorts on. He thought that was kind of suspicious. He stated that he immediately recognized one of the individuals as a male who had frequented the victim's apartment before.

He told me he didn't know his name but he knew what he looked like because he had been over there before.

Q. At some point did you develop Mr. Boyd as a suspect in this case?

A. Yes.

Q. And based on that did you compile a photo lineup or photo array to show to Mr. Bowen?

A. Yes, I did.

**{¶ 6}** Smith identified the photo array that he compiled by means of "a program called OHLEG," or "Ohio Law Enforcement Gateway." Smith explained that "through this program we can basically look anybody up and see their criminal record, see their driving history, what vehicles are registered to them, and all kinds of things." Smith testified that there "is a feature on OHLEG that allow[s] officers to create a photo lineup or a photo array. It's called the lineup. When you look the person up as the suspect and the program automatically generates comparable photographs of other individuals that * * * kind of have the similar features to that suspect and it creates a printout like this." The following exchange occurred:

Q. Can you explain what you did with that photo lineup once you created it?

A. I took this photo lineup to Mr. Bowen and showed him this photo lineup, and almost immediately he was able to identify the defendant, Daniel Boyd, as the person who he saw acting suspicious around the victim's apartment on April 18th.

Q. At any time prior to showing him that photo array, did you identify to him any individuals in that photo array?

A. No, I did not.

Q. * * * You didn't say Daniel Boyd is one of these pictures (sic)?

A. No.

Q. On the second page of that there is a key; is that correct?

A. Yes, there is.

Q. That wasn't shown to Mr. Bowen prior to him looking at the photo array, was it?

A. No. This page, these were detached when I originally made it and he was shown this page only, and this page is listing the actual names of the individuals in the photo array.

Q. The individual he selected was Mr. Boyd?

A. Yes.

{¶ 7}   Smith stated that in the course of his investigation, he also spoke to Nate Knox, and that Knox gave him information that led him to believe that Boyd was involved in the burglary. Smith stated that "when he made contact with Mr. Knox, I talked to him on the phone and based on his witness statements it was kind of brief and I asked him questions on what he had put in writing; and he indicated in his statement that he had witnessed Mr. Boyd." When counsel for Boyd objected on the basis of hearsay, the prosecutor responded, "I'll move on, Your Honor," and the court did not rule on the objection.

{¶ 8}   Smith stated that after he spoke with Knox, he "filed a warrant for burglary," which he served on Boyd in late May, 2012. The following exchange occurred:

Q. Could you explain how that service warrant came about?

A. Yes, I will. I was on patrol along with another South Charleston police officer, was patrolling the area of Williams and Willow Street, and I witnessed Mr. Boyd in the backyard of, I believe, the address is 45 South Williams Street.

He was standing near a bonfire with some other individuals. We actually made entry onto the property by foot and made contact with Mr. Boyd.

\* \* \*

Q. \* \* \* You approached the bonfire?

A. Approached the bonfire. I saw who I believed to be Mr. Boyd by the bonfire. I asked him, "Are you Daniel Boyd?" Of course, I was fairly certain, 95% certain it was. He stated, "No, I'm Wesley." He said, "No, my name is Wesely." And he immediately got up and started walking towards the house. I said, "We need to talk about this. Can I see some ID"?

He said he didn't have any identification. I informed him that he was under arrest; he had a warrant out for his arrest and at that time he resisted arrest. He stiffened up. He would not place his hands behind his back, became very confrontational, yelling basically stating, "Get your hands off of me," and had a few other choice words.

We were finally able to get him in custody and when we walked him back to the police cruiser, of course, he had his identification in his pocket that identified him as Daniel Boyd.

Smith identified Boyd in the courtroom.

{¶ 9} On cross-examination, when asked about Midkiff's failure to immediately phone the police upon discovery of the burglary, Smith testified that Midkiff "stated that he

was so upset with regards to what Mr. Boyd had did that he was out looking for him himself and he was gonna handle it himself." Smith stated that he did not process the crime scene for fingerprints, and he stated that there "is no physical evidence other than the photo array." Smith stated that there is no surveillance equipment in the area around the apartment. Smith stated that at the time of Boyd's arrest, Smith "told him he had a warrant for burglary."

{¶ 10} Thomas Bowen testified that he resides at 355 Clifton Road, apartment 28, in South Charleston, and that apartment 32 is directly across from his. The following exchange occurred regarding the events of April 18, 2012:

Q. At some point did you see someone near or suspicious around apartment 32?

A. Yes, I did.

Q. Could you explain to the jurors how you first became aware of these individuals?

A. I was outside doing some yard work behind the unit, and they were kind of hanging around for a minute and had hoods over their heads.

And it was kind of warm out and I thought it was unusual that they had those hoods over their heads and was wearing shorts, so I kind of kept an eye on them.

Q. * * * And that's to the rear of your unit, correct?

A. Yes, it is.

Q. And your front door and the front door to apartment 32, they actually face each other; is that correct?

A. That's correct.

Q. After you first see these individuals where do they go from there?

A. Well, when I went back into my apartment, I continued to kind of look outside and I saw them walk beside and behind apartment 32, and then they came back around the sidewalk and they went up to his door; but they did not - - they weren't within distance where they could touch the door and they turned around and faced my apartment where I could see their faces, and then they turned around and left.

Q. * * * At the time that this all occurred was Mr. Midkiff home?

A. No, he wasn't.

Q. How did you know he wasn't at home.

A. Prior to that I observed him walking out of his apartment. He had two fishing poles in his hand, and he went to his car and left.

Q. What were you doing outside that you saw all of this?

A. Like I said, I was doing some yard work. There is a patio fence and I was up against that fence and it's kind of like an L shape, and there is like a webbing at the top of the fence where you can see through. That's how I was able to see them when I heard voices.

{¶ 11} Bowen stated that he recognized "the first subject" but did not know his name, and he stated that he had "seen him going over to the victim's apartment before." Bowen identified the photo array that Smith showed him, and he testified that he "was able to identify the individual by these photos," indicating the bottom middle photograph in the

array.   Bowen stated that Smith "just told me to circle it and put my name underneath it," and that he did so. Bowen identified Boyd in the courtroom as the person whose photograph he circled and as the person he observed near Midkiff's apartment.

{¶ 12}   Bowen testified that he observed Boyd in the area between 15 and 20 minutes after he observed Midkiff leave his apartment.   Bowen stated that he did not observe Boyd enter Midkiff's apartment.   Bowen testified that he left his apartment and went to Springfield at about 4:45 p.m., and that he returned around 7:15 p.m.   He stated that after he returned home, he did not hear anyone breaking into apartment 32.   Bowen estimated that the distance between his apartment and Midkiff's is "about a hundred feet."

{¶ 13}   On cross-examination, Bowen responded affirmatively when asked, "Your statement says this happened sometime - - your observations were made sometime between 4:00 to 4:30 that day; is that correct?"   Bowen stated that he has previously observed Boyd at Midkiff's apartment "maybe once or twice," and that Midkiff "has some friends that go over there on occasion."   Bowen stated that he and Midkiff are not personal friends.   He testified that he does not wear glasses.

{¶ 14}   Ryan Midkiff testified that he knows Boyd, that he "met him through Dustin Anglemeyer," and that Boyd had been to Midkiff's residence prior to April 18, 2012. Midkiff stated that on the date of the burglary, Boyd called him "while I was working and asked me what I was doing, and I told him as soon as I was getting off work that I was going fishing."   Midkiff stated that he works "at Pine Village," where he also resides.   Midkiff testified that he planned to stop working at 5:00 p.m., but that he "got off a little bit early though."   According to Midkiff, Boyd "called me again and asked me if I had left yet,"

between 4:30 and 5:00 p.m. Midkiff testified that he informed Boyd that he "was getting ready to leave and go fishing right then." Midkiff testified as follows:

> * * * He called me later on but I was at Clark Lake fishing and the fish were starting to bite, and I couldn't answer the phone.

> He called I think about 7:30 and then he called me back about an hour after that and I answered, and he asked me where I was and I told him that I was fishing still.

> And he told me that he wasn't going to come over and that he was going to go ahead and go in town, and he would get ahold (sic) of me later.

{¶ 15} Midkiff stated that it was unusual for Boyd to call that many times, but that he "wasn't thinking too much about it." Midkiff testified that he returned home about 9:00 or 9:30 p.m., that his door "had been kicked in," and that as "soon as I seen it, I knew what happened. It was like it all come (sic) together to me." According to Midkiff, the "dead bolt was sticking out. The whole molding on the inside was completely knocked out and where the dead bolt goes into the latch was ripped completely out of the door." Upon entering his residence, Midkiff stated that he "noticed a few things that were knocked over and the thing that I had kept money in was broken. It was shattered. It was a big glass red ball. It was broken all over the ground, and then I noticed my X-Box was gone and my PS-2 was gone."

{¶ 16} Midkiff stated that his electronics were located beside his TV, immediately to the left of the front door, and that the glass ball was on a shelf in a cabinet next to the games. Midkiff testified that Boyd knew that he kept money in the glass container.

According to Midkiff, Boyd had stopped by his apartment two or three days earlier "at the most" and asked for a ride to the store to buy cigarettes. Midkiff stated Boyd "came into the door and I said, you ready. He said yeah, and I turned around and I grabbed money out of [the glass ball] and I thought he was already out of the door, but he must have seen me grab it out." Midkiff stated that he suspected that Boyd committed the burglary, and that he attempted to contact Boyd, calling him multiple times. Midkiff testified that he was unable to locate Boyd, and that he called the South Charleston police the next morning.

{¶ 17} On cross-examination, Midkiff stated that Boyd inquired about his plans on the date of the burglary because, according to Boyd, he "wanted to come over and wait until Dustin came home." Midkiff denied smoking marijuana with Boyd or selling marijuana to him. Midkiff stated that he has smoked marijuana with Dustin Anglemeyer but he denied selling marijuana to him. Midkiff also denied selling marijuana to Justin Cydrus and Nate Knox. He stated that his father "talked me out of going and trying to find Danny Boyd" on the morning after the burglary. When asked, "Isn't it really the truth here the reason you didn't call the cops until the next morning is because you didn't want to bring a cop into your place when it might still have drug paraphernalia and drug residue all around?", Midkiff replied, "No." Midkiff stated that he went to Dustin Anglemeyer's residence after the burglary because he believed that Anglemeyer was involved in the offense. Midkiff identified his phone number on Boyd's phone records, and he testified that the records indicate that Boyd called him at 3:50 p.m., 5:09 p.m., 7:30 p.m., and 8:29 p.m. on April 18, 2012, and that Midkiff called Boyd at 8:30 p.m., 9:19 p.m., 9:23 p.m. and 9:27 p.m. on the same date.

{¶ 18}  The following exchange occurred during Midkiff's testimony regarding Nate Knox:

Q.  Do you know as far as your relationship with some of these other fellas, you mentioned that Nate Knox, you hardly know him at all?

A.  Yes, sir. * * *.

Q.  Did you talk with him after this burglary occurred?

A.  Yes, sir.    He's friends with him.

Q.  How was it that you talked to him about it?

A.  I went up to him and asked him if he knew Danny Boyd.   He told me he knew him.   And I said I think he broke into my house, and he looked at that (sic) and he said, "Let me guess, an X-Box 360 and Play Station slim."

Q.  When was that conversation?

A.   I'm not sure exactly but as soon as we got done with the conversation, I had called the South Charleston police and had them come down because I wanted him to fill out a statement because I never said anything about what merchandise was taken out of my apartment, but he knew right away.

* * *

Q.  Mr. Knox wrote a statement?

A.  Yes, sir.

{¶ 19}  When asked about his relationship with Boyd, Midkiff replied that Boyd "had come over a couple of times and wanted to wait for Dustin to get off work at 3:00 or

4:00, * * * and I let him stay in my apartment until then, * * * and then he called me one time, one time only and asked me if I would run him to the store to get him cigarettes." Midkiff stated that Boyd "showed up at my apartment one night at 3:00 in the morning and asked me to take him home, and I told him, no. Other than that he's never been to my apartment." On redirect examination, Midkiff testified that at 3:50 p.m., he advised Boyd that he was going fishing, that at 5:09 p.m. he informed Boyd that he was not at home, and that there was no reason for Boyd to be at Midkiff's apartment on the date of the burglary around 5:00 p.m.

{¶ 20} Nate Knox testified that he "was forced to" attend Boyd's trial and testify against his wishes. He stated that he has known Boyd "[f]orever," and that he and Boyd "used to be really good friends. We don't talk no more." Knox stated that on the date of the burglary, as he was leaving his apartment, he observed Boyd "[c]oming up to Dylan's house," and that Boyd "just stopped me and asked me if I knew anybody that wanted to buy an X-Box." Knox stated that Boyd "was just carrying a white X-Box." Knox testified that he observed Boyd with the X-Box at approximately 5:00 p.m. Knox testified that he told Boyd, "* * * the old white ones were outdated, didn't have the connector or nothing." Knox stated that he did not observe a PS-2 in Boyd's possession, and he stated, "* * * like I said nobody even plays them anymore." Knox stated that Boyd also called "the next day and asked if I knew anybody that wanted to buy one, and I said no. * * *."

{¶ 21} Knox testified as follows regarding his relationship with Midkiff:

Q. Do you know Ryan Midkiff?

A. Yeah.

Q. How do you know Ryan?

A. Because I just filed some charges on Ryan two days ago.

Q. You guys haven't had a good relationship?

A. No.

Q. You're not friends with him?

A. No, no, no.

Q. The two of you haven't got together and plotted this against Danny, have you?

A. No.

Q. As a matter of fact, you became aware that his house was burglarized after he threatened you or confronted you about it?

A. Yeah. I was threatened to write the police report and everything.

Q. Did that influence what you wrote in any way?

A. No.

Q. You told the truth?

A. Yes, sir.

{¶ 22} On cross-examination, when asked if he "wrote a statement or the chief asked you questions and wrote answers?", Knox responded, "It wasn't a chief. It was a sergeant." He identified his signature on the statement. He read from his statement as follows: "I saw Danny walking down the road with a white X-Box, and he later called asking if I wanted to buy it, X-Box 360." Knox indicated that the sergeant asked him additional questions, and that the sergeant wrote down Knox's responses. Knox

acknowledged that in response to a question from the sergeant about the time of  day when he observed Boyd near Midkiff's apartment, "the answer  written down was around 5:00 p.m."  Knox stated that in response to a question regarding when Boyd called him, he indicated, "later that night, * * * at around 9 or 10 p.m."  Knox identified his phone number on Boyd's phone records, which indicate that Boyd did not phone him on April 18, 2012, and the following exchange occurred:

Q. * * * There is the - - all the calls on April 18th.  10:49[p.m.]. That's the last call on the 18th.  Do you see your phone number listed anywhere on there?

A.  No.  I just talked to him that day and he called me the next day. That's what it was.

Q.  But you told the police that he called you that evening?

A.  They pressured me into filing out (sic) that report anyway so.

Q.  They pressured you?

A.  Yeah.  I got stopped like - - I'll say that, I got stopped at a stop light and asked to fill out a report.  I said I didn't feel comfortable writing a report yet.  He said, why don't you pull over; you ain't got a license anyways.

Q.  They pressured you in what way?

A.  Nonstop harassment.  Ryan Midkiff pressured me.

Q.  How well do you know Ryan Midkiff?

A.  I don't talk to him.  He just talked mad crap.  The only reason I

know him is from this incident.

**{¶ 23}** On redirect examination by the State, the following exchange occurred:

Q. You were put in a crappy position, weren't you?

A. Yes.

Q. Ryan Midkiff putting pressure on you?

A. Yeah.

Q. Police putting pressure on you?

A. Yeah.

Q. You didn't want to come in here, and then I told you you had to, didn't I?

A. Yeah.

Q. But you tried to do what was right?

A. Yeah.

Q. You told the truth?

A. Yes, sir.

**{¶ 24}** Boyd testified that on April 18, 2012, he "was staying in Springfield at a friend of mine's house on 2727 Main Street in Springfield." He stated that he pled guilty to felony burglary in 2003, when he was 19 years old, that he received five years probation, and that he "took full responsibility for it." Boyd stated that he has known Midkiff for two or three years, and that he buys "weed" from Midkiff. He testified that he has done so for "two or three months, four months maybe, I'd been going there every other day, every two days." According to Boyd, Midkiff "actually took me to the store one time to get cigarettes

all because I needed change to buy weed." Boyd stated that Midkiff also sold "weed" to Dustin Anglemeyer and Justin Cydrus, and that he assumed that Boyd sold "weed" to Knox. Boyd stated that he has known Anglemeyer for ten years or more, and "we use[d] to hang out like all the time." Boyd stated that he has "been hanging out with [Cydrus] probably the past three to four years on a regular basis." He stated that he has known Knox for years, although he and Knox "weren't that close, but I knew him because of my little brother."

{¶ 25} Boyd stated that when he wanted to get in touch with Midkiff, he called his cell phone, and that Midkiff lived in the Pine Village apartment complex. The following exchange occurred:

Q. Tell me, when you would go over there, would you be invited into his apartment or was this something that you handled at the door?

A. No. I would actually go in. He would shut the door so that none of his neighbors would see him sell me pot.

Q. And how long would you be in there?

A. About 15 minutes.

Q. Why so long?

A. Just so it didn't look too suspicious. He didn't want all the neighbors thinking that he was dealing drugs, so he wanted me to sit down for about fifteen minutes, hang out for a minute, so when I left, it didn't look like I was there for 2 minutes, grabbed something and then leave.

{¶ 26} Boyd stated that on April 18, 2012, he wanted to purchase some marijuana

from Midkiff, and that he called him "* * * and asked if he was home so I could come in town and purchase a sack. He told me that he would be there until around 5:00 'cause he was gonna go fishing. If I made it there before 5:00 I could get some." At the time of the call, Boyd stated that he "was actually at Frickers in Springfield, shooting darts" with Cydrus, where he remained until "about 9:00 at night." Boyd testified that "* * * I even actually called after that around 5:00 to see if he hadn't left yet because I found a ride to make it there, but he said he was leaving so I didn't even try." Boyd stated that he called Midkiff around 7:30 p.m. and "just asked him if he's home yet, and he said, no, I'll call you when I get home." Boyd stated that he called Midkiff again at 8:29, and that Midkiff "actually did not answer that conversation and called me right back at 8:30 and said he was leaving to come home. He'd call me as soon as he got there and I could come pick up a sack."

{¶ 27} Boyd stated that he received a call from Midkiff at 9:19 p.m., and that "[h]e's wigging out. I can barely understand what he's saying on the phone, but he starts cussing at me saying something about me robbing him. I told him I didn't know what he was talking about. I was in Springfield all day waiting on him so I can get weed." Boyd stated that Midkiff called him back four minutes later, "* * * still cussing and screaming. He wants to know what Dustin's number is so he can call Dustin and cuss Dustin out. I told him me and Dustin hadn't even seen each other that day, and I wouldn't give him the number because I didn't want him to harass one of my friends." Boyd indicated that when Midkiff called a third time, Boyd hung up on him. Boyd stated that Angelemeyer called him on the night of the burglary "[b]ecause Ryan showed up at his house wigging out on him,

cussing him out and everything."

**{¶ 28}** Regarding his arrest, Boyd stated that he was surprised when the police approached him at the bonfire, and he admitted that he provided a false name to them. Boyd stated, "I didn't know they were arresting me. I was walking toward the back door. Officer Smith came up and grabbed my arm, and I kept asking him why he was arresting me and he wouldn't tell me, so I wouldn't tell him who I was because I didn't know why I was being arrested."

**{¶ 29}** Boyd denied that Knox observed him with an X-Box 360 around 5:00 p.m. on the date of the burglary, and he denied discussing the X-Box 360 with Knox. Boyd testified that Bowen is "wrong" about seeing him near Midkiff's apartment on April 18, 2012, and he stated that he "woke up in Springfield and stayed in Springfield all day." He denied burglarizing Midkiff's apartment.

**{¶ 30}** On cross-examination, Boyd stated that he was at Frickers with Cydrus from around 3:30 p.m. to 9:00 p.m., and that they "[d]rank a few beers, played some darts, had some food." Boyd stated that he did not save his receipt. Boyd testified that he is good friends with Cydrus and Anglemeyer, and that Angelmeyer was with him the night of his arrest. Boyd maintained that Midkiff threatened him when he called after the burglary, but he did not call the police about the threats.

**{¶ 31}** Dustin Anglemeyer testified that he has known Boyd for about 10 years, and that the two of them "* * * hang out all the time. He's a good guy to be around." Anglemeyer stated that he has known Midkiff for three to five years, and that he knows him "[n]ot all that well." According to Anglemeyer, Midkiff "introduced himself and he told

me that he sold marijuana, and that was how I knew him." Anglemeyer stated that he bought marijuana from Midkiff two or three times a week for "$5 to $20 at a time." Anglemeyer testified as follows regarding the burglary:

> Well, Ryan had came to my house, my apartment, and he knocked on the door and I answered the door, and he walked in and he was standing at my door and he said I think Danny just broke into my house. And I said well, I don't - - Why are you coming to me about it? He was just raging.

> And telling me that I needed to tell him where Danny was or he was gonna hurt me and then he wanted to go and hurt Danny, and then he started accusing me of knowing that Danny had broken into his house, you know, he was just ranting about, "I want you to get ahold (sic) of Danny and I want you to bring him over here so I can get my hands on him."

{¶ 32} Anglemeyer stated that Midkiff came to his apartment between 9:00 and 10:00 p.m., and that he told Midkiff " * * * to get out of my house before I call the police on you," and "* * * that's when he really, really threatened me * * * ." According to Anglemeyer, "* * * for about two weeks later everyday [Midkiff] harassed me and my fiancee. He was going to her work. I work right across from my house and when I walked home, maybe two or three times out of the two weeks he would drive by and threaten me." Anglemeyer stated that he " * * * filed a charge against him for menacing." Anglemeyer stated that the charge was dismissed and that the prosecutor "* * * told me that he didn't have much to go on and he wasn't gonna get nothing for it and it was in my best interest to drop the case so I didn't go back to court."

**{¶ 33}** On cross-examination, Anglemeyer stated that he stopped smoking marijuana a year and a half ago, but that "[i]f I knew somebody that needed something and they would call me, I might help them out and get them a blunt, so I'd go ahead and get it" from Midkiff. Anglemeyer acknowledged that Boyd is one of his best friends.

**{¶ 34}** Justin Cydrus testified that Boyd is a "good friend," and that he has known him "[f]or about four years." Cydrus testified that he and Boyd "* * * hang out. We go out, play darts together. We use[d] to smoke weed together. Just stuff that young people do, I guess." Cydrus stated that he learned of the burglary when "[m]y other friend Dustin called me and said that Ryan was at his house saying that one of them had burglarized his apartment." Cydrus provided testimony consistent with Boyd's about the two of them being at Frickers on April 18, 2012. He stated that he met Boyd there, and that "DJ" drove Boyd to the restaurant. Cydrus stated that he observed Boyd using his cell phone while they were there because "[w]e were trying to find some marijuana to smoke." Cydrus stated that he knows Midkiff "[b]ecause whenever I go out to South Charleston, I have friends that live out there and whenever we want some weed, that's who you call to get weed." Cydrus stated that Boyd told him that "* * * he was trying to call Ryan because he couldn't find any marijuana in Springfield." Cydrus stated that his friend "DJ" picked him and Boyd up at Frickers at 9:00 p.m. and drove them home. When asked why Boyd did not go to Midkiff's apartment to get weed, Cydrus replied, "I'm guessing that Ryan didn't answer the phone, and we got marijuana from someone else. * * * Somebody answered in Springfield but they brought it to Frickers" at "* * * about 7:00." Cydrus stated that Boyd spoke to Midkiff several times on the phone, "* * * But I guess Ryan was doing something or - - I don't know

what was going on."

{¶ 35} On cross-examination, Cydrus stated that he is enrolled in a drug intervention program, and that he is an addict recovering from the abuse of marijuana, cocaine and alcohol. Cydrus stated that he began his recovery in June, 2012, and that he was abusing drugs and alcohol on April 18, 2012. Cydrus responded affirmatively when asked, "Do you know addicts to steal?" Cydrus stated that he found out that Boyd was charged with burglary "* * * when I got out of jail" on June 2, 2012. Cydrus stated that he did not call the police or the prosecutor's office to provide Boyd's alibi because "I didn't know I was supposed to call and tell him (sic) that." The following exchange occurred:

Q. So it never occurs to you to call the prosecutor who has charged your friend with this crime and tell him that he didn't commit it?

A. No.

Q. The first time you said anything to anyone other than the defense attorney is today in this courtroom; is that correct?

A. Yes.

Q. This is your very good friend?

A. Yes.

Q. You didn't try and help him out one bit until today?

A. No. Well, I talked to his defense attorney when I realized that he needed - -

MR. DRISCOLL: I have nothing further.

{¶ 36} Boyd asserts nine assignments of error herein. Boyd's brief provides as

follows:

This Court has granted [Boyd] leave to file a brief on his own behalf, and thus a brief was respectfully submitted to the Appellant Panel of Judges for their review. The Court having reviewed the pro se brief determined that there likely were issues for appeal and appointed Attorney Gregory Lind to review the matter and submit a brief on behalf of [Boyd]. Counsel for [Boyd] finds his pro se brief to be sound, well written, and researched. Counsel for [Boyd] includes his brief within the brief currently being filed for this Court.

{¶ 37} We will consider Boyd's first, second, and fourth assignments of error together. They are as follows:

"THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT APPELLANT'S CONVICTION FOR BURGLARY AS A FELONY OF THE THIRD DEGREE,"

And,

"THE JURY'S VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

And,

"THE TRIAL COURT COMMITTED PLAIN ERROR BY ALLOWING THE CASE AGAINST APPELLANT TO PROCEED TO TRIAL BASED UPON INSUFFICIENT EVIDENCE."

{¶ 38} As this Court has previously noted:

* * * A sufficiency of the evidence argument challenges whether the

State has presented adequate evidence on each element of the offense to allow the case to go to the jury or to sustain the verdict as a matter of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541, 1997-Ohio-52. The proper test to apply to such an inquiry is the one set forth in paragraph two of the syllabus of *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492: "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."

In contrast, when reviewing a judgment under a manifest weight standard of review "[t]he court reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [factfinder] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which evidence weighs heavily against the conviction." *Thompkins*, supra, quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717.

*State v. Neal*, 2d Dist. Montgomery No. 23298, 2010-Ohio-1128, ¶ 13-14.

**{¶ 39}** As this court has further noted:

The credibility of the witnesses and the weight to be given to their testimony are matters for the trier of facts to resolve. *State v. DeHass* (1967), 10 Ohio St.2d 230. In *State v. Lawson* (Aug. 22, 1997), Montgomery App. No. 16288, we observed:

"Because the factfinder ... has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness."

*State v. Alford*, 2d Dist. Montgomery No. 23332, 2010-Ohio-2493, ¶ 17-18.

**{¶ 40}** R.C. 2911.12(A) provides: "No person, by force, stealth, or deception, shall do any of the following: * * * (3) Trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, with purpose to commit in the structure or separately secured or separately occupied portion of the structure any criminal offense."

**{¶ 41}** In his first assigned error, Boyd asserts that the State " * * * produced no evidence at trial that [Boyd] committed the burglary; no physical evidence such as

fingerprints, none of the items that were reported stolen, nothing other than testimonies that are conflicting, and to the extent that Nathaniel Knox[] testifies he was pressured into making a statement against Appellant, by the Chief of Police Derek Smith, under extortive circumstances during a traffic stop." (Sic). Boyd cites Bowen's testimony that he observed Boyd approach Midkiff's apartment and then depart before being close enough to Midkiff's door to touch it. In his second assigned error, Boyd asserts that "[n]o evidence was presented at trial that [Boyd] was in the structure to commit a criminal offense." In his fourth assigned error, Boyd asserts that "[t]hough an acquittal was not raised by Appellant's Counsel, the basis is the same element in that there was never sufficient evidence to allow this case to go to a jury, and the Court erred in allowing the case to do so."

{¶ 42} Smith testified that he observed signs of forced entry when he arrived at Midkiff's apartment on April 19, 2012, namely "heavy damage to the door frame." Smith stated that it appeared to him that "the door was locked and someone had kicked it in." Smith stated that after talking to Bowen and Knox, Boyd became a suspect in the case. Smith testified that Boyd attempted to walk away from him and provided a false name upon his arrest.

{¶ 43} Bowen testified that on the day of the burglary, around 4:00 to 4:30 p.m., after he observed Midkiff leave his apartment with fishing poles, he observed individuals in shorts walking around Midkiff's apartment. Bowen stated that it was a warm day, and that he thought it was suspicious that the individuals he observed had hoods over their heads. Before they departed the area, Bowen stated that he observed the individuals turn and face his apartment "where I could see their faces." Bowen testified that he recognized Boyd as

someone he had seen at Midkiff's apartment on previous occasions. Bowen stated that he identified Boyd in the photo array presented by Smith, and he identified Boyd in court as the person he observed in the area of Midkiff's apartment. Bowen stated that he left his apartment at 5:45 p.m. on the date of the burglary and did not return until 7:00 p.m.

{¶ 44} Midkiff testified that he informed Boyd in two phone calls that he was going fishing after work, that he told Boyd specifically that he was leaving between 4:30 and 5:00 p.m., and that there was no reason for Boyd to be at his apartment around 5:00 p.m. on the date of the burglary. Midkiff stated that Boyd subsequently called him repeatedly to inquire about his whereabouts, and that it was unusual for him to do so. Midkiff stated that Boyd told him at 7:30 pm. that he "wasn't going to come over and that he was going to go ahead and go in town." Midkiff's testimony regarding the condition of his apartment when he returned home was consistent with Smith's. He stated that the "big glass red ball" where he kept his money had been shattered, and that Boyd knew Midkiff kept cash in the glass ball, since Boyd observed Midkiff retrieve money therefrom two or three days earlier. In addition to the cash, Midkiff stated that his X-Box and PS-2 were missing from their location immediately to the left of the front door. Midkiff testified that he suspected that Boyd committed the burglary and immediately attempted to reach him by phone.

{¶ 45} Knox testified that he observed Boyd with an X-Box on the date of the burglary, around 5:00 p.m., and that Boyd indicated the X-Box was for sale. Knox testified that he was truthful when providing his statement to the police that he observed Boyd "walking down the road with a white X-Box * * *" around 5:00 p.m.

{¶ 46} Having examined the evidence admitted at trial in a light most favorable to

the State, we conclude that, if the jury believed: 1) the testimony of Bowen regarding Boyd's suspicious presence in the area of Midkiff's apartment on the date of the burglary, as well as his in court identification of Boyd; 2) Smith's and Midkiff's testimony that Midkiff's apartment had been broken into; 3) Midkiff's testimony regarding the stolen items (including an X-Box 360) and Boyd's knowledge of their location within his apartment, and 4) Knox's testimony that he observed Boyd with an X-Box 360 that Boyd offered to sell on the date of the burglary, the State presented sufficient circumstantial and direct evidence to establish beyond a reasonable doubt that Boyd, by force, stealth or deception, trespassed in Midkiff's apartment, with purpose to commit a theft offense.

{¶ 47} Further, having reviewed the entire record, having weighed the evidence and all reasonable inferences, and having considered the credibility of the witnesses, we cannot conclude that the jury clearly lost its way such that a manifest miscarriage of justice occurred in Boyd's conviction. While Boyd asserts that there was no direct evidence, such as fingerprints or DNA evidence, linking Boyd to the burglary, the jury was free to infer, as noted above, that Boyd, who was initially observed by Bowen in the area of Boyd's apartment (suspiciously wearing a hood on a warm day), and later observed by Knox carrying an X-Box, which Midkiff reported as stolen, committed the burglary. The jury was further free to infer that Boyd (who two or three days earlier observed the location of Midkiff's cash), repeatedly phoned Midkiff to determine his whereabouts in order to commit the burglary undetected. The jury was free to discredit the alibi testimony of Boyd and Cydrus, and we defer to their assessment of credibility. Cydrus admitted that he was abusing alcohol and drugs on the date of the burglary. We note that both Cydrus and Anglemeyer

are Boyd's good friends, while Knox, who reluctantly testified against Boyd, further testified that he and Boyd "used to be really good friends. We don't talk anymore."

{¶ 48} For the foregoing reasons, we conclude that Boyd's conviction is supported by sufficient evidence, and that it is not against the manifest weight of the evidence. Boyd's first and second assignment of error are accordingly overruled. Regarding Boyd's fourth assignment of error, he acknowledges that defense counsel did not move for an acquittal pursuant to Crim. R. 29, and since sufficient evidence was admitted to sustain Boyd's conviction, plain error is not demonstrated. Boyd's fourth assignment of error is overruled.

{¶ 49} Boyd's third assignment of error is as follows:

"THE TRIAL COURT ERRED IN PERMITTING NATHANIEL KNOX'S TESTIMONY INTO EVIDENCE AFTER HE TESTIFIED THAT HE WAS PRESSURED BY INVESTIGATING OFFICER TO MAKE THE STATEMENT THAT WAS USED TO GAIN THE CONVICTION."

{¶ 50} Counsel for Boyd adduced evidence that Knox felt pressured by the police into implicating Boyd, and he directs our attention to Knox's testimony that he was pressured at a stop light into making a statement. According to Boyd, "[w]hen Judge Rastatter heard this statement, with the likelihood of extortive or forceful tactics had been used to coerce the witness into making statements against [Boyd], which were being used by the State to gain the conviction, the Judge has a duty and obligation to see that justice is done in his courtroom." Boyd asserts that he was deprived of a fair trial. We note that Knox testified that he did not want to provide a statement to the police, but that he did so. He testified on direct and redirect that he told the truth when making his statement, namely

that he observed Boyd with an X-Box on the date of the burglary. This is clearly admissible testimony which is not subject to exclusion, and no objection was made thereto. Finally, we note that the extent to which the jury may have believed that Knox was pressured by the police into implicating Boyd is an issue going to the weight to be given to his testimony, and not its admissibility. Boyd's third assigned error is overruled.

{¶ 51} Boyd's fifth assignment of error is as follows:

"[THE] TRIAL COURT ERRED WHEN VIOLATING THE ABUSE OF DISCRETION STANDARD BY IMPOSING A NON-MINIMAL SENTENCE, THE MAXIMUM SENTENCE UPON APPELLANT."

{¶ 52} Boyd asserts that while he "concedes that his sentence is within the statutory guidelines and therefore not contrary to law, analysis of the R.C. § 2929.12 factors as applied to this case reveal a clear abuse of discretion by the trial court."

{¶ 53} As this Court recently noted:

In *State v. Rodeffer*, 2013-Ohio-5759, 5 N.E.3d 1069 (2d Dist.), we held that we would no longer use an abuse-of-discretion standard in reviewing a felony sentence, but would apply the standard of review set forth in R.C. 2953.08(G)(2).[] Under this statute, an appellate court may increase, reduce, or modify a sentence, or it may vacate the sentence and remand for resentencing, only if it "clearly and convincingly" finds either (1) that the record does not support certain specified findings or (2) that the sentence imposed is contrary to law. *Rodeffer* stated that "[a]lthough [*State v. Kalish*, 120 Ohio St.3d 23, 2008-Ohio-4912, 896 N.E.2d 124] no longer provides the

framework for reviewing felony sentences, it does provide * * * adequate guidance for determining whether a sentence is clearly and convincingly contrary to law. * * * According to *Kalish*, a sentence is not contrary to law when the trial court imposes a sentence within the statutory range, after expressly stating that it had considered the purposes and principles of sentencing set forth in R.C. 2929.11, as well as the factors in R .C. 2929.12. (Citations omitted) *Rodeffer* at ¶ 32.

*State v. Battle*, 2d Dist. Clark No. 2014 CA 5, 2014-Ohio-4502, ¶ 7.

**{¶ 54}** Boyd was convicted of a third degree felony. Pursuant to R.C. 2929.14(A)(3)(b), the trial court had discretion to impose a sentence of "nine, twelve, eighteen, twenty-four, thirty, or thirty-six months." As this Court noted in *Battle*:

"The trial court has full discretion to impose any sentence within the authorized statutory range, and the court is not required to make any findings or give its reasons for imposing maximum or more than minimum sentences." *State v. King*, 2013-Ohio-2021, 992 N.E.2d 491, ¶ 45 (2d Dist.). However, in exercising its discretion, a trial court must consider the statutory policies that apply to every felony offense, including those set out in R.C. 2929.11 and R.C. 2929.12. *State v. Leopard*, 194 Ohio App.3d 500, 2011-Ohio-864, 957 N.E.2d 55, ¶ 11 (2d Dist.), citing *State v. Mathis*, 109 Ohio St.3d 54, 2006-Ohio-855, 846 N.E.2d 1, ¶ 38.

R.C. 2929.11 requires trial courts to be guided by the overriding principles of felony sentencing. Those purposes are "to protect the public

from future crime by the offender and others and to punish the offender using the minimum sanctions that the court determines accomplish those purposes without imposing an unnecessary burden on state or local government resources." R.C. 2929.11(A). The court must "consider the need for incapacitating the offender, deterring the offender and others from future crime, rehabilitating the offender, and making restitution to the victim of the offense, the public, or both." *Id.* R.C. 2929.11(B) further provides that "[a] sentence imposed for a felony shall be reasonably calculated to achieve the two overriding purposes of felony sentencing * * *, commensurate with and not demeaning to the seriousness of the offender's conduct and its impact upon the victim, and consistent with sentences imposed for similar crimes committed by similar offenders."

R.C. 2929.12(B) sets forth nine factors indicating an offender's conduct is more serious than conduct normally constituting the offense; R.C. 2929.12(C) sets forth four factors indicating that an offender's conduct is less serious. R.C. 2929.12(D) and (E) each list five factors that trial courts are to consider regarding the offender's likelihood of committing future crimes.

*Id.*, ¶ 9-11.

**{¶ 55}** At sentencing, the trial court heard statements from defense counsel, the prosecutor, and Boyd. Defense counsel indicated that Boyd had a prior burglary conviction from 2003. The trial court indicated as follows: "I do find that the defendant has a prior burglary conviction ; therefore, this is his second burglary conviction. I am going to order

that the defendant be sentenced to three years in the Ohio State Penitentiary and pay court costs. * * * ." Boyd's judgment entry of conviction provides as follows: "The Court considered the record, oral statements of counsel, the defendant's statement, the defendant's prior criminal record, the principles and purposes of sentencing under Ohio Revised Code Section 2929.11, and has balanced the seriousness and recidivism factors under Ohio Revised Code Section R.C. 2929.12."

{¶ 56} As we noted in *Battle,* "[i]n *State v. Miller*, 2d Dist. Clark No. 09-CA-28, 2010-Ohio-2138, we held that a defendant's sentence was not contrary to law when the trial court expressly stated in its sentencing entry that it had considered R.C. 2929.11 and R.C. 2929.12, but did not mention those statutes at the sentencing hearing." *Id*., ¶ 15. While Boyd received a maximum sentence, it is within the statutory range, and we cannot conclude that it was clearly and convincingly unsupported by the record, or contrary to law, or constituted an abuse of discretion. Boyd's fifth assignment of error is overruled.

{¶ 57} For ease of analysis, we will next consider Boyd's eighth assignment of error. It is as follows:

"THE PHOTO SPREAD IDENTIFICATION PROCEDURE WAS NOT IN COMPLIANCE WITH R.C. 2933.83 AND WAS UNDULY SUGGESTIVE."

{¶ 58} Boyd failed to raise this issue in a motion to suppress, and he has waived the argument set forth in his eighth assignment of error. *See State v. McGillvary*, 2d Dist. Miami No. 2012-CA-7, 2012-Ohio-5538, ¶ 9 ("[T]he failure to file a motion to suppress within the time specified by Crim.R. 12(C) constitute[s] a waiver of any objection to the admissibility of that evidence." *State v. Duncan*, 8th Dist. Cuyahoga No. 84587,

2005-Ohio-6241, ¶ 7 (Citations omitted.)"). Accordingly, Boyd's eighth assigned error is overruled.

{¶ 59}   Finally, we will consider Boyd's sixth, seventh, and ninth assignments of error together.   They are as follows:

"APPELLANT'S ATTORNEY JOHN HAMMOND PROVIDED INEFFECTIVE ASSISTANCE OF COUNSEL WHEN HE FAILED TO FILE A MOTION TO SUPPRESS STATEMENTS MADE AGAINST APPELLANT WHEN THE WITNESS NATE KNOX TESTIFIED THAT HE WAS PRESSURED INTO MAKING THEM BY [THE] CHIEF OF POLICE, WHICH REASONABLY DID AFFECT THE OUTCOME OF THE JURY'S VERDICT."

And,

"APPELLANT'S ATTORNEY JOHN HAMMOND WAS INEFFECTIVE BY FAILING TO CROSS-EXAMINE THE CHIEF OF POLICE DEREK SMITH PERTAINING TO PRESSURING WITNESS NATE KNOX INTO MAKING A FALSE STATEMENT TO GAIN A CONVICTION."

And,

"APPELLANT'S ATTORNEY JOHN HAMMOND PROVIDED INEFFECTIVE ASSISTANCE OF COUNSEL AND WHEN HE FAILED TO FILE A MOTION TO SUPPRESS THE PHOTO SPREAD IDENTIFICATION AND FAILING (sic) TO CROSS-EXAMINE THE POLICE OFFICER WHO CONDUCTED THE PHOTO SPREAD IDENTIFICATION."

{¶ 60}   As the Supreme Court noted in *Strickland v. Washington*, 466 U.S. 668,104

S.Ct. 2052, 80 L.Ed.2d 674 (1984), "the proper standard for attorney performance is that of reasonably effective assistance. * * *." *Id*., 687. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment. * * *." *Id.*, 691. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. * * *." *Id*., 693. The *Strickland* Court further noted, "[o]n the other hand, we believe that a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case." *Id*. "The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Id*., 694. Finally, the Court in *Strickland* determined that to establish ineffective assistance, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*.

{¶ 61} Regarding Boyd's sixth assignment of error, he asserts that Boyd's "attorney failed to suppress or object to [Knox's] extorted false statement, * * * coerced by threat, from remaining on the record. * * ."

{¶ 62} Crim.R. 12(C) provides as follows:

Prior to trial, any party may raise by motion any defense, objection, evidentiary issue, or request that is capable of determination without the trial of the general issue. The following must be raised before trial:

* * *

(3) Motions to suppress evidence, including but not limited to statements and identification testimony, on the the ground that it was illegally obtained. Such motions shall be filed in the trial court only.

{¶ 63} Since a motion to suppress is a *pretrial* motion, ineffective assistance is not demonstrated by defense counsel's failure to file such a motion in response to Knox's testimony in the course of trial.

{¶ 64} To the extent that Boyd asserts that defense counsel was ineffective for failing to object to Knox's inculpatory testimony, "[a] debatable decision involving trial tactics generally does not constitute a deprivation of effective counsel. *State v. Phillips* (1995), 74 Ohio St.3d 72, 656 N.E.2d 643, 1995-Ohio-171." *State v. Russell*, 2d Dist. Montgomery No. 21458, 2007-Ohio-137, ¶ 50. "Trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. * * *." *State v. Woullard*, 158 Ohio App. 3d 31, 2004-Ohio-3395, 813 N.E.2d 964, ¶ 37 (2d Dist.). As noted by the Supreme Court of Ohio:

As the United States Court of Appeals for the Sixth Circuit has recently explained, "experienced trial counsel learn that objections to each potentially objectionable event could actually act to their party's detriment. * * * In light of this, any single failure to object usually cannot be said to have been error unless the evidence sought is so prejudicial * * * that failure to object essentially defaults the case to the state. Otherwise, defense counsel must so consistently fail to use objections, despite numerous and clear reasons for doing so, that counsel's failure cannot reasonably have been said

to have been part of a trial strategy or tactical choice." *Lundgren v. Mitchell* (C.A.6, 2006), 440 F.3d 754, 774. Accord *State v. Campbell* (1994), 69 Ohio St.3d 38, 52-53, 630 N.E.2d 339.

*State v. Johnson*, 112 Ohio St. 3d 210, 2006-Ohio-6404, 858 N.E.2d 1144, ¶ 140.

**{¶ 65}** Prior to Knox's testimony, Midkiff testified that after he spoke to Knox about the burglary, "I wanted him to fill out a statement because I never said anything about what merchandise was taken out of my apartment, but [Knox] knew right away." Knox testified on direct examination that he observed Boyd with an X-Box around the time of the burglary. As noted above, while Knox subsequently stated that he "was threatened to write the police report," he further testified that he told the truth in doing so. Finally, defense counsel was able to cross-examine Knox about his statement to police, and it was in the course of cross-examination that defense counsel adduced evidence that the police allegedly obtained the statement by threatening Knox with a traffic violation. Defense counsel was further able to demonstrate the discrepancy between Knox's testimony that Boyd phoned him on the evening of the burglary, after Knox observed Boyd with the X-Box, and Boyd's phone records, which show no such call from Boyd to Knox after 5:00 p.m. As noted above, Knox's alleged "coercion" goes to the weight to be given his testimony and not its admissibility. For the foregoing reasons, we cannot conclude that defense counsel's failure to object to Knox's testimony based upon alleged coercion by the police fell below an objective standard of reasonableness. Since ineffective assistance of counsel is not demonstrated, Boyd's sixth assignment of error is overruled.

**{¶ 66}** Regarding Boyd's seventh assignment of error, he asserts that defense

counsel "was ineffective by failing to cross-examine witness, Chief of Police Derek Smith, about pressuring witness or forcing him into making a false statement against [Boyd], which the State used to gain the conviction, by swaying the jury's verdict." Evid. R. 611(B) provides that "[c]ross-examination shall be permitted on all relevant matters and matters affecting credibility." We note that Smith, who testified first at trial, stated that he spoke with Knox *briefly* on the phone about the contents of Knox's written statement. Evidence of Knox being pressured into implicating Boyd was not adduced until Knox subsequently testified (and we note that Knox did not identify Smith as the officer who stopped him at the stop light, and he specifically testified that he provided his written statement to a sergeant, and not Smith). Finally, defense counsel was able, as noted above, to cross-examine Knox about the alleged "pressure used to obtain the statement from Knox." For the foregoing reasons, we cannot conclude that defense counsel's representation, in failing to cross-examine Smith about pressuring Knox, fell below an objective standard of reasonableness such that Boyd was prejudiced. Boyd's seventh assignment of error is overruled.

{¶ 67} Regarding Boyd's ninth assignment of error, he asserts that defense counsel was ineffective in failing to raise the State's failure to comply with R.C. 2933.83 in a motion to suppress and in failing "to point out that the photo spread identification was unduly suggestive." Boyd further asserts that defense counsel was ineffective in failing to cross-examine Smith at trial regarding his assembly and administration of the photo array to Bowen.

{¶ 68} As this Court has noted:

R.C. 2933.83(B) "requires any law enforcement agency or criminal justice entity that conducts live lineups and photo lineups to adopt specific procedures for conducting the lineups." *State v. Ruff*, 1st Dist. Hamilton No. C-110250, 2012-Ohio-1910, ¶ 5. These procedures include, inter alia, using "a blind or blinded administrator" to conduct a photo lineup. R.C. 2933.83(B)(1). Under R.C. 2933.83(C)(1), evidence of a failure to comply with the required protocol "shall be considered by trial courts in adjudicating motions to suppress eyewitness identification resulting from or related to the lineup." Failure to comply with the blind- or blinded-administrator requirement, however, does not provide an independent basis for suppression. Instead, the penalty for failure to comply with R.C. 2933.83 is that "the jury shall be instructed that it may consider credible evidence of noncompliance in determining the reliability of any eyewitness identification." *State v. Stevenson*, 2d Dist. Montgomery No. 24821, 2012-Ohio-3396, ¶ 16.

*State v. Simpson*, 2d Dist. Montgomery No. 25163, 2013-Ohio-1696, ¶ 11.

**{¶ 69}** Pursuant to R.C. 2933.83(A)(2), a "blind administrator" is defined as an administrator "who does not know the identity of the suspect," while a blinded administrator is defined, pursuant to R.C. 2933.83(A)(2), as an administrator who "may know who the suspect is, but does not know which lineup member is being viewed by the eyewitness. 'Blinded administrator' includes an administrator who conducts a photo lineup through the use of a folder system or a substantially similar system." The folder system provides for the inclusion of the suspect's photograph with five "'filler photographs,'" and four "'blank

photographs,'" which are placed into ten empty folders and shuffled; the administrator accordingly does not know which folder the witness is viewing when the array is administered. R.C. 2933.83(A)(6). The statute does not require the use of the folder system.

{¶ 70} It is clear from Smith's testimony that he failed to comply with R.C. 2933.83 when administering the photo array to Bowen. It is evident from Smith's testimony and the "Photo Lineup Key" that Smith prepared that he was neither a blind nor blinded administrator, since he was aware of Boyd's identity and the location of his photo in the array. While Boyd asserts that the identification procedure was unduly suggestive, Smith testified that he did not identify Boyd to Bowen or indicate that his image was in the array. The photo array is before us and we have examined it. Six images of Caucasian men with brown eyes and other comparable features are exhibited therein, and we cannot conclude that the array is unduly suggestive of Boyd's identity. As noted above, failure to comply with the statute does not provide an independent basis for suppression, and we cannot conclude that, had Boyd filed a motion to suppress the photo array identification, that the motion would have been granted. In other words, even if we conclude that ineffective assistance is demonstrated by the failure to file a motion to suppress (or cross-examine Smith regarding the identification procedure), we cannot conclude that the result of the trial would have been different or, as Boyd asserts, that "the jury would have come to a different outcome with knowledge that the police department did not comply with R.C. §2933.83." To the extent that counsel for Boyd may also be asserting, regarding the photo array administration, that defense counsel was ineffective in failing to seek a jury instruction, namely that the jury

"may consider credible evidence of noncompliance in determining the reliability of any eyewitness identification," again we cannot conclude, pursuant to *Strickland*, that a reasonable probability exists that, but for the unprofessional errors of counsel, the result of the trial would have been different, or that counsel's unprofessional errors are sufficient to undermine confidence in the outcome of the trial. Boyd's ninth assignment of error lacks merit not only because Boyd fails to make clear the "unduly suggestive" nature of the procedure beyond Smith's failure to comply with R.C. 2933.83, but also because Bowen testified that he recognized Boyd on the date of the burglary as someone he had seen on previous occasions at Midkiff's apartment, and he so identified Boyd in court. Further, other evidence links Boyd to the burglary. Accordingly, Boyd's ninth assignment is overruled.

{¶ 71} Having overruled Boyd's nine assignments of error, the judgment of the trial court is affirmed.

. . . . . . . . . .

FAIN, J., concurs.

FROELICH, P.J., dissenting:

{¶ 72} Regarding the Ninth Assignment of Error, defense counsel did not request, and the trial court did not give, the instruction mandated by R.C. 2933.83 when that statute's requirements are not followed.

{¶ 73} In the "routine" evaluation of ineffective assistance claims involving failure to file a motion to suppress or request a certain jury instruction, courts examine whether such failure made a difference in the outcome. However, here the legislature has provided that

the "jury <u>shall be instructed</u> that it may consider credible evidence of non-compliance . . ." (emphasis added); I would hold that on this record, there is not proof beyond a reasonable doubt that failure to follow this explicit imperative was harmless error and would reverse.

. . . . . . . . . .

Copies mailed to:

Ryan A. Saunders
Gregory K. Lind
Hon. Douglas M. Rastatter